## MARKHAM, ALIEN PROPERTY CUSTODIAN, ET AL. v. CABELL.

No. 76. Argued October 19, 1945.—Decided December 10, 1945.

*Mr. Paul A. Freund* argued the cause, and *Acting Solicitor General Judson, Assistant Attorney General Wechsler, Messrs. M. S. Isenbergh* and *Raoul Berger* were on the brief, for petitioner.

*Mr. Hartwell Cabell,* with whom *Mr. Charlton Ogburn* was on the brief, for respondent.

*Messrs. George Whitefield Betts, Jr.* and *George Yamaoka* filed a brief as *amici curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondent, an American citizen, brought this suit against the Alien Property Custodian and the Treasurer of the United States to recover from the assets of the Assicurazioni Generali di Trieste e Venezia, an Italian

insurance company, the unpaid portion of a claim for legal services rendered that company. The assets of the company had vested in the Alien Property Custodian in 1942 [1] and the vested assets had been delivered to him. The suit was sought to be maintained under § 9 (a) of the Trading with the Enemy Act (40 Stat. 411, as amended 41 Stat. 977, 50 U. S. C. App. § 9 (a)) which allows "Any person not an enemy or ally of enemy . . . to whom any debt may be owing from an enemy or ally of enemy whose property or any part thereof shall have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian" to sue the Custodian or the Treasurer of the United States in the federal courts. Petitioners moved to dismiss on the ground that the claim did not qualify under § 9 (e) of the Act. Sec. 9 (e), which was added to the Act in 1920 (41 Stat. 980) and amended in 1928 (45 Stat. 271), provides that no debt shall be allowed under § 9 "unless it was owing to and owned by the claimant prior to October 6, 1917" nor "unless notice of the claim has been filed, or application therefor has been made, prior to the date of the enactment of the Settlement of War Claims Act of 1928." In view of those provisions of § 9 (e) the District Court dismissed the complaint. The Circuit Court of Appeals reversed. 148 F. 2d 737. The case is here on a petition for a writ of certiorari which we granted because of the public importance of the question presented.

If § 9 (e) is applicable here, the suit may not be maintained since the debt was not in existence on October 6,

---

[1] See Vesting Order 218, dated October 7, 1942, 7 Fed. Reg. 9466; Vesting Order 468, dated December 9, 1942, 8 Fed. Reg. 1038. For the establishment of the office of Alien Property Custodian and the definition of his functions as respects the vesting of alien property, see Executive Order 9193, dated July 6, 1942, 7 Fed. Reg. 5205, amending Executive Order 9095, dated March 11, 1942, 7 Fed. Reg. 1971.

1917, nor had notice of the claim been filed or application therefor been made prior to the date of the enactment of the Settlement of War Claims Act of 1928. We would have quite a different case if § 9 (a) and (e) had been enacted after the outbreak of the recent war. For we may assume that Congress could set up such barriers as it chose to the enforcement of the claims of an alien's creditors against the seized property. But the doubt as to the applicability of § 9 (e) to the present situation arises because that provision was part of the legislation enacted after the outbreak of World War I to deal with the claims against property seized during that period. That legislation was not reenacted when the recent war broke out. It automatically went into effect again at that time.[2] Hence the argument that these provisions of § 9 (e) are limited to claims against property seized during World War I. Our conclusion is that they are so limited.

In the first place, § 9 (e) disallows recovery "to any person who is a citizen or subject of any nation which was associated with the United States in the prosecution of the war, unless such nation in like case extends reciprocal rights to citizens of the United States." When it is recalled that § 9 (e) was first added to the Act in 1920, it seems tolerably clear that the words "was associated with the United States in the prosecution of the war" refer to World War I. The use not only of the past tense but

---

[2] As the Circuit Court of Appeals pointed out, that followed from several circumstances: (a) § 2 (c) defined "the beginning of the war" to mean "midnight ending the day on which Congress has declared or shall declare war or the existence of a state of war"; (b) § 302 of the First War Powers Act, approved December 18, 1941 (55 Stat. 838, 840) assumed that the Trading with the Enemy Act had not been in force before December 8, 1941, and that it went into effect again at that time; and (c) § 5 (b) of the Trading with the Enemy Act was amended December 18, 1941, by the First War Powers Act without any mention of the other parts of the earlier Act. 55 Stat. 839.

also of the concept of "associate" is significant. As Judge Learned Hand speaking for the Court below said, the word "associate" was used during World War I "in sedulous avoidance of any implication" that we had "allies." In the second place, the time limitations contained in § 9 (e) point the same way. As the United States says, some sections of the Act were explicitly restricted to situations growing out of World War I, as, for example, § 3 (d). But it seems to us that the provisions of § 9 (e) with which we are now concerned carry almost as plain a hallmark. For the restriction of suits to debts which were owing to and owned by the claimant prior to October 6, 1917 and as respects which a notice of claim had been filed prior to the date of the enactment of the Settlement of War Claims Act of 1928 strongly suggests that Congress was dealing exclusively with World War I claims, not with claims which might arise in some future war. As of 1920 and 1928 the time limitations written into § 9 (e) had no other relevancy. The Committee Reports,[3] accompanying the legislation by which § 9 (e) was added to the law, while not explicit on the precise point, show that Congress was concerned solely with the handling of claims which then existed. There is not the slightest suggestion that Congress was drafting a statute of limitations likewise applicable to claims which might be asserted in case the United States at some future time again went to war. These considerations indicate to us that it would be a

---

[3] See H. Rep. No. 1089, 66th Cong., 2d Sess.; S. Rep. No. 273, 70th Cong., 1st Sess., p. 29; H. Rep. No. 17, 70th Cong., 1st Sess., p. 20. In S. Rep. No. 273, *supra*, it was stated: "Under the existing law a creditor of a person whose property was seized by the Alien Property Custodian may file a claim and institute proceedings for the payment of the debt, under certain conditions. Inasmuch as these claimants have had more than 10 years in which to file their claims, this provision is amended by subsection (b) of section 12 of the proposed bill so as to permit payment only where the claim was filed prior to the date of the enactment of the bill."

distortion to read § 9 (e) as if Congress in December 1941 decided that the statute of limitations applicable to World War I claims should likewise be applicable to World War II claims. If we gave § 9 (e) that broad interpretation, we would, in the third place, deprive § 9 (a) of all meaning so far as World War II claims were concerned. That we hesitate to do, for the Act was not only designed to operate in the first World War; it was also to become effective at the time of any future war unless repealed or superseded. Yet the remedy afforded by § 9 (a) would be quite illusory and ineffective so far as it applies to World War II claims if § 9 (e) were read literally without regard to its history. It was for this reason particularly that the court below refused "to make a fortress out of the dictionary" and to read § 9 (e) strictly and literally. The policy as well as the letter of the law is a guide to decision. Resort to the policy of a law may be had to ameliorate its seeming harshness or to qualify its apparent absolutes as *Holy Trinity Church* v. *United States*, 143 U. S. 457 illustrates. The process of interpretation also misses its high function if a strict reading of a law results in the emasculation or deletion of a provision which a less literal reading would preserve.

The United States, however, contends that such a construction of § 9 (e) would gravely interfere with the efficient administration of alien property controls in accordance with policies adopted by Congress in relation to World War II. It points out that by virtue of amendments to § 5 (b) of the Trading with the Enemy Act which were made on December 18, 1941 by the First War Powers Act (55 Stat. 839, 50 U. S. C. App., Supp. IV, § 616), the Executive is now armed with far more comprehensive power over alien property and the property of other foreign interests than in World War I. Now there is the "freezing" or "blocking" of foreign funds aimed at the immobilization of foreign assets in the United States by prohibiting,

without a license, any transactions involving them—a program initiated after the invasion by Germany of Denmark and Norway and administered by the Treasury.[4] If the Treasury refuses a license permitting payment of creditors out of blocked funds, neither the creditor nor the owner has any remedy as a matter of right under the Act. It is said that to allow creditors of certain aliens whose property has been vested in the Alien Property Custodian to maintain suits but to disallow suits by creditors of aliens whose funds are merely frozen is to destroy consistency in the position of creditors under the Trading with the Enemy Act. Moreover, § 9 (a) permits suits on debt claims only if the debt is one "owing from an enemy or ally of enemy" whose property has been taken. By the 1941 amendment to § 5 (b) the vesting power has not been so limited but extends to "any property or interest of any foreign country or national." The argument is that to construe § 9 (e) so as to permit creditors of an enemy to sue is to discriminate without warrant against creditors of non-enemy foreign nationals who are given no such remedy. Moreover, it is said that if § 9 (e) is not a barrier to suits, a race of diligence would be started with no guarantee of any equitably ordered priority in the payment of the claims out of the seized property. It is also argued that if these suits are allowed the operations of the Custodian would be burdened with litigation.

We have concluded that however meritorious these considerations are, they raise questions of policy for Congress. We are concerned only with the right to sue on a debt under § 9. Congress granted that right to some claimants and withheld it from others. Whether its choice was wise or not is not for us to say. The right to sue, explicitly granted by § 9 (a), should not be read out of the law

---

[4] This program, initiated by Executive Order 8389, dated April 10, 1940, 5 Fed. Reg. 1400, was ratified by Congress on May 7, 1940, by Joint Resolution. 54 Stat. 179.

unless it is clear that Congress by what it later did withdrew its earlier permission. We can find no indication in the 1941 legislation that Congress by amending § 5 (b) desired to delete or wholly nullify § 9 (a). On the contrary, the normal assumption is that where Congress amends only one section of a law, leaving another untouched, the two were designed to function as parts of an integrated whole. We should give each as full a play as possible. Moreover, we are able to find in the amendment to § 5 (b) no suggestion or indication that Congress was writing a different statute of limitations than was then contained in § 9 (e). The 1941 amendment is as silent on that score as it is on the right to sue afforded by § 9 (a).

It is true that § 5 (b) gave a broader grant of authority to the Executive than had existed under the original Act.[5] As respects the seizure of property it provides:

---

[5] As stated in H. Rep. No. 1507, 77th Cong., 1st Sess., pp. 2–3:

"Section 5 (b) of the Trading With the Enemy Act has been continued down to the present time. The existing system of foreign property control (commonly known as freezing control) is based on that subdivision as last amended on May 7, 1940. That subdivision of section 5 as it is now in effect, however, does not give the broad powers to take, administer, control, use, liquidate, etc., such foreign-owned property that would be given by section 301 of the bill.

"At present the Government exercises supervision over transactions in foreign property, either by prohibiting such transactions or by permitting them on condition and under license. It is, therefore, a system which can prevent transactions in foreign property prejudicial to the best interests of the United States, but it is not a system which can affirmatively compel the use and application of foreign property in those interests.

"Section 301 remedies that situation by adding to the existing freezing control, in substance, the powers contained in the Trading With the Enemy Act with respect to alien property, extending those powers, and adding a flexibility of control which experience under the original act and the recent experience under freezing control have demonstrated to be advisable. The provisions of section 301

"any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe *such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States,* and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes." (Italics added.)

It is said that the survival of the privilege of satisfying debt claims as a matter of right out of vested property is inconsistent with the new power granted the Executive by § 5 (b) to make any affirmative use of the property that the national interest in time of war might require. But we are here concerned solely with the right to sue on a debt, not with the right to sue to reclaim property nor with any question concerning the satisfaction of any judgment which may be obtained. We only hold that the right to sue on a debt granted by § 9 (a) has not been wholly withdrawn and that § 9 (e) is not applicable to this class of claims. We cannot see that the allowance of

---

would permit the establishment of a complete system of alien property treatment. It vests flexible powers in the President, operating through such agency or agencies as he might choose, to deal with the problems that surround alien property or its ownership or control in the manner deemed most effective in each particular case. In this respect the bill avoids the rigidity and inflexibility which characterized the alien property custodian law enacted during the last war. The necessity for flexibility in legislation on this subject is accentuated by the vastness of the alien property problem confronting the Government today. At the peak of his activity, the Alien Property Custodian of the last war administered property valued at something over $500,000,000. Today there is over $7,000,000,000 worth of property already subject to the existing control."

And see S. Rep. No. 911, 77th Cong., 1st Sess., p. 2.

a suit on a debt as prescribed by § 9 (a) collides with the policy of § 5 (b). That does not in any way cause interference with the administration of the vested property pursuant to § 5 (b). Sec. 9 (a), to be sure, contains a provision which prescribes how any judgment obtained in the suit against the Custodian or Treasurer shall be satisfied;[6] and also allows suits to reclaim property.[7] Whether those provisions have been superseded by § 5 (b) or whether § 5 (b) contains a grant of authority which may be so exercised as to prevent the reclamation of property or the payment of the judgment or to alter the procedure for reclamation or payment as prescribed in § 9 (a) are distinct questions. Here we are dealing solely with the right to maintain a suit on a debt, a right which is not shown to collide with § 5 (b). We reserve decision on the other questions.

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE BURTON, concurring.

A review of the development of the Trading with the Enemy Act from its inception in 1917, early in World War

---

[6] "If suit shall be so instituted, then such money or property shall be retained in the custody of the Alien Property Custodian, or in the Treasury of the United States, as provided in this Act, and until any final judgment or decree which shall be entered in favor of the claimant shall be fully satisfied by payment or conveyance, transfer, assignment, or delivery by the defendant, or by the Alien Property Custodian, or Treasurer of the United States on order of the court, or until final judgment or decree shall be entered against the claimant or suit otherwise terminated."

[7] Sec. 9 (a) allows suits by "Any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States," as well as suits by any such person to whom a debt may be owing from any enemy or ally of enemy whose property has been seized.

I, further discloses its dual purposes in a way that throws needed light upon its meaning at the time of this proceeding in 1944, late in World War II.

It originated as H. R. 4960, June 11, 1917, drafted in the form of permanent legislation. Its purposes were explained by House and Senate Committees in terms suited to permanent legislation.[1] Before its passage, several amendments were inserted which limited specific sections of the Act to "the present war,"[2] but none of these so limited § 9 or the Act as a whole. Other sections were limited by references made to specific nations and still others by references to specific dates. Later amendments added other provisions confined to World War I. However, no general limitation ever has confined the Act as a whole or its main structural provisions to a specific war, specific nations or specific dates. In this way the Act has met the immediate needs of its time and also has stood ready to meet additional wars and additional enemies. The beginning of World War II in 1941 accordingly found

---

[1] "The chief objects of this bill are (1) to recognize and apply concretely, subject to definite modifications, the principle and practice of international law interdicting trade in time of war, and (2) to conserve and utilize upon a basis of practical justice enemy property found within the jurisdiction of the United States. . . . According to American law one of the immediate consequences of war is to put an end to all commercial relations between citizens or subjects of belligerent nations." H. R. Rep. No. 85, 65th Cong., 1st Sess., 1, June 21, 1917. "To summarize the purpose of the bill is not to create new international rules or practices, but to define and mitigate them." H. R. Rep. No. 85, *supra*, p. 2. "The purpose of this bill is to mitigate the rules of law which prohibit all intercourse between the citizens of warring nations, and to permit, under careful safeguards and restrictions, certain kinds of business to be carried on. It also provides for the care and administration of the property and property rights of enemies and their allies in this country pending the war." Sen. Rep. No. 113, 65th Cong., 1st Sess., 1, Aug. 31, 1917.

[2] The conference report inserted five such references. H. R. Rep. No. 155, 65th Cong., 1st Sess., 3, 6, September 21, 1917.

many provisions of the Act, such as § 9 (e), limited by references to World War I, and others, such as § 9 (a), not so limited.

By its terms, its nature and its history, § 9 (e) [3] from its inception has related solely to World War I. Its relation to World War I is apparent on its face. Its first clause refers to a restriction on the allowance of a debt "to any person who is a citizen or a subject of any nation *which was associated with the United States in the prosecution of the war.*" These words, enacted in 1920 (41 Stat. 977, 980) and reenacted in 1923 (42 Stat. 1511, 1514), refer to any nation "associated" with us in World War I. "Associated" was then a word of art. Its second clause reads, *"nor in any event shall a debt be allowed under this section unless it was owing to and owned by the claimant prior to October 6, 1917."* This refers to the effective date of the original Trading with the Enemy Act. This date provides a reasonable test for debts to be al-

---

[3] Section 9 (e) of the Trading with the Enemy Act, as last amended, August 24, 1937 (50 U. S. C. App., § 9 (e)), is as follows:

"No money or other property shall be returned nor any debt allowed under this section to any person who is a citizen or subject of any nation which *was associated* with the United States in the prosecution of the war, unless such nation in like case extends reciprocal rights to citizens of the United States: *Provided,* That any arrangement made by a foreign nation for the release of money and other property of American citizens and certified by the Secretary of State to the Attorney General as fair and the most advantageous arrangement obtainable shall be regarded as meeting this requirement; *nor in any event shall a debt be allowed under this section unless it was owing to and owned by the claimant prior to October 6, 1917,* and as to claimants other than citizens of the United States unless it arose with reference to the money or other property held by the Alien Property Custodian or Treasurer of the United States hereunder; *nor shall a debt be allowed under this section unless notice of the claim has been filed, or application therefor has been made, prior to the date of the enactment of the Settlement of War Claims Act of 1928* (Act March 10, 1928, ch. 167)." (Italics supplied.)

lowed against property seized by the Alien Property Custodian in connection with World War I. It has no reasonable relation to a war beginning in 1941. To require claims to be more than 24 years old in order to be acceptable is beyond reason. The last clause reads, *"nor shall a debt be allowed under this section unless notice of the claim has been filed, or application therefor has been made, prior to the date of the enactment of the Settlement of War Claims Act of 1928."* This clause means nothing when applied to a claim like the present one which was not earned until 1935.

Section 9 (e) as thus earmarked prescribes a natural limitation upon claims to be allowed against enemy property seized in World War I. As such it is reasonable. It is not possible, however, that Congress intentionally chose this indirect way of saying that American creditors may assert just claims against assets of debtors whose properties were seized in World War I, but not against assets of debtors whose properties might be held in custody by the Alien Property Custodian as a result of future wars.

The legislative history emphasizes this. The original Trading with the Enemy Act, when enacted, October 6, 1917 (40 Stat. 411), contained two kinds of provisions. The general structure of the Act was in terms of permanent legislation. Section 2 in defining terms refrained from reference to the war then in progress or to specific nations or fixed dates. For example, it provided that:

"The words 'the beginning of the war,' as used herein, shall be deemed to mean midnight ending the day on which Congress has declared or shall declare war or the existence of a state of war.

"The words 'end of the war,' as used herein, shall be deemed to mean the date of proclamation of exchange of ratifications of the treaty of peace, unless the President shall, by proclamation, declare a prior date, in which case the date so proclaimed shall be deemed to be the 'end of

the war' within the meaning of this Act." (50 U. S. C. App., § 2 (c).)

Sections 3 (a), (b) and (c) dealt in like terms with general procedure for trading under Presidential license in time of war. Section 5 (b) dealt with the regulation of foreign exchange, coin export, transfers of credit, etc. Section 6 authorized the President to appoint an official to be known as the Alien Property Custodian. Section 9 provided for the assertion of property claims and debt claims on behalf of any person not an enemy or ally of enemy against certain assets in the possession of the Custodian.

On the other hand, certain other provisions were, from the beginning, earmarked as temporary provisions. For example, § 3 (d) referred to certain censorship to be established "during the present war." Section 4 (a) referred to certain German insurance companies. Section 4 (b) referred to "the present war." Similar references to "the present war" occurred in §§ 11, 13 and 14.

Section 9 is typical. Originally it was all of a general and permanent nature. It has been amended nine times. Its first paragraph has been preserved, with slight changes, as § 9 (a) in the form of permanent legislation. On the other hand, many new subsections of § 9, including § 9 (e), contain provisions suited only to transactions growing out of World War I. The first amendment to § 9 was that of July 11, 1919 (41 Stat. 35). This threatened to confuse the situation. It inserted in the first paragraph a proviso referring to (41 Stat. 36) "all property *heretofore* determined by the President to have been held . . . for the benefit of a person who was an enemy or ally of enemy" and to "territory of any nation associated with the United States in the prosecution of the war which *was* occupied by the military or naval forces of *Germany or Austria-Hungary, or their allies.*" (Italics supplied.) On June 5, 1920, however, the second amendment (41 Stat. 977)

corrected this and set the pattern which has since been followed. It reenacted the whole of § 9 and, in doing so, removed from its first paragraph the 1919 proviso. It restored that paragraph to general terms and gave it the designation of § 9 (a) which it has retained. Congress, at the same time, added several subsections most of which contained express references to Germany and Austria-Hungary. Section 9 (e) first appeared at that time. From the beginning, § 9 (e) contained its present references to "any nation which *was associated* with the United States in the prosecution of the war" and to the requirement that a debt in order to be allowed under the section must have been *"owing to and owned by the claimant prior to October 6, 1917."* Later amendments emphasized this restriction of § 9 (e) to World War I, while preserving the general and permanent character of § 9 (a).[4]  Distor-

---

[4] The later amendments were those of February 27, 1921 (41 Stat. 1147), applying §§ 9 (b) (2) and (3) to situations where a woman "prior to April 6, 1917, intermarried with a subject or citizen of Germany or Austria-Hungary";

December 21, 1921 (42 Stat. 351), amending § 9 (a) to permit suits to be brought eighteen months instead of six months after the "end of the war." The amendment did not insert any calendar date relating to World War I although peace had been declared July 2, 1921. The words "end of the war" must, therefore, be given their general meaning applicable to all wars as provided in the definitions in § 2, *supra;*

December 27, 1922 (42 Stat. 1065), amending § 9 (a) to permit suits to be brought 30 months instead of 18 months after the "end of the war";

March 4, 1923 (42 Stat. 1511), reenacting the whole § 9. In § 9 (a) it omitted all limitation on the time within which suits might be brought. It added new subsections especially adapted to World War I claims such as a restriction against claims on behalf of citizens of the United States naturalized since November 11, 1918;

May 7, 1926 (44 Stat. 406), adding §§ 9 (b) (3A) and (3B) as to citizens of Germany, Austria, Hungary or Austria-Hungary;

March 10, 1928 (45 Stat. 254–279). This was the "Settlement of War Claims Act of 1928." It dealt expressly with World War I. It

tion of the meaning of statutory language would result not from limiting § 9 (e) to World War I but from applying it to World War II.

It is argued that to exclude the defense which is claimed to be supplied by § 9 (e) against debts payable out of property vested in the Custodian during World War II, under § 5 (b), as amended by the First War Powers Act, December 18, 1941 (55 Stat. 839), will result in inequities. For example, it is urged that § 5 (b) was amended in 1941 to permit vesting in the Custodian of property of "any foreign country or national thereof." However, § 9 (a) has not been amended correspondingly to permit the assertion of claims to the payment of debts out of the property of a foreign national as distinguished from that of an "enemy or ally of enemy." From this it is argued that Congress should not be regarded as having intended to create such inequities, if there be such, between creditors of "enemies" and those of other "foreign nationals," through the passage of the First War Powers Act; and that, therefore, Congress must be regarded as having intended that § 9 (e) eliminate all creditors' claims under § 9 (a) against property of enemies and of allies of enemies, unless filed or claimed before March 10, 1928.

This amounts to an argument that because subsequent legislation has produced inequitable results, therefore pre-existing legislation should be reinterpreted so as to

---

was concerned with such subjects as the "Mixed Claims Commission" and "The Tripartite Claims Commission." It amended the Trading with the Enemy Act in many details as to World War I claims and added many new provisions as to those claims. It added subsections to § 9. In § 9 (e) it inserted the clause which required that notices of claims must have been filed or applications for claims must have been made before the enactment of the Settlement of War Claims Act of 1928;

August 24, 1937 (50 Stat. 748), amending § 9 (e) by inserting the proviso as to arrangements which will be regarded as meeting the requirements of reciprocal rights.

eliminate these subsequently created inequities. If the meaning of § 9 (e) was restricted to World War I prior to the enactment of the First War Powers Act, the First War Powers Act cannot change the meaning of § 9 (e) without amending it, and it does not amend it. A suggestion that amendatory legislation might now be helpful is found in bills recently introduced in Congress with the support of the Alien Property Custodian. The hearings emphasize that need.[5]

Furthermore, the interpretation now urged to offset inequities would create other inequities. For example, the proposed interpretation would result in an inequity to the respondent in the present case. He is an American citizen with an admittedly good claim for about $7,000 earned in 1935, against an enemy corporation, assets of which in the hands of the Alien Property Custodian are ample to pay the claim. The claimant filed his claim within the one year prescribed in the order vesting the assets of the enemy company in the Custodian.[6] The claimant is now met with a defense that he cannot recover because he failed to file his claim before March 10, 1928, which was seven years before it was earned and fourteen years before the assets had been vested in the Custodian with whom he is asked to file his notice. The decision as to the existence of inequities under the 1941 amendment and as to the best way to deal with them lay with Congress in 1941 and still lies there.

The Act never has had a termination clause and was expressly excluded from the Joint Resolution of March 3, 1921 (41 Stat. 1359), which declared that certain acts of

---

[5] S. 1940, H. R. 4840 and H. R. 5031 were introduced in the 78th Congress. H. R. 1530 was introduced in the 79th Congress, January 16, 1945. See Hearings on H. R. 4840 before Subcommittee No. 1 of the Committee on the Judiciary of the House of Representatives, 78th Cong., 2d Sess., Serial No. 18, June 9–15, 1944.

[6] See note 10 *infra*.

Congress should be construed as if the war had ended and the present or then existing emergency had expired. The Settlement of War Claims Act of 1928 [7] was engrafted upon the Trading with the Enemy Act without affecting its general structure or its life. In the natural course of events World War I claims ultimately would have been disposed of and yet the main structure of the Act would have remained on the books ready for later use. That this was contemplated is evidenced by Executive Order 6694, May 1, 1934.[8] This was issued under authority of the Reorganization Act of March 3, 1933 (47 Stat. 1489, 1517). Section 1 expressly abolished the Office of the Alien Property Custodian and transferred the "authority, rights, privileges, powers, and duties conferred and imposed on the Alien Property Custodian by law and/or Executive Order . . . to the Department of Justice, to be administered under the supervision of the Attorney General." This incorporated the office of the Alien Property Custodian into the permanent structure of the Government. Within the Department of Justice the rights, privileges, powers and duties conferred upon the Alien Property Custodian were placed under the Attorney General and were later exercised largely through him or the Assistant Attorney General in charge of the Claims Division in the Department of Justice. On May 15, 1939, by Executive Order 8136, 4 Fed. Reg. 2044, all power and authority conferred upon the President by §§ 9, 12, 20 and 21 of the Trading with the Enemy Act and all power and authority which the President under that Act had theretofore ordered to be exercised through the Alien Property Custodian were vested in and required to be exercised through the Attorney General or the Assistant Attorney General in charge of the Claims Division in the Department of Justice.

In this status § 9 (a) and other permanent portions of

[7] See note 4 *supra*.

[8] 28 C. F. R. § 4.1.

422

the Trading with the Enemy Act awaited the next war. If left in that form there would have been no inequities other than those which had existed in World War I. The Act would have been administered much as it was in World War I except that it would have been administered through the Attorney General and the Department of Justice instead of through an independent agency. In 1940, at the approach of World War II, the Act had much the same structure in §§ 9 (a), 9 (e) and 5 (b) as it had in 1928. The inequities discussed in this proceeding arose later from the substantial expansion of § 5 (b).[9]

---

[9] The development of the law especially affecting § 5 (b) which took place during the national emergency prior to World War II, did not change the situation although it did emphasize the connection of the Trading with the Enemy Act with the permanent structure of the Federal Government.

For example, on March 9, 1933 (48 Stat. 1), § 5 (b), relating to foreign exchange, export or hoarding of coin, etc., was amended as a part of the legislative program to meet the national emergency in banking. The amendment thus applied the power of the President under this Act to the internal conditions of the country rather than to its international relations. This was supplemented by Executive Order 6560, January 15, 1934, 31 C. F. R. § 127.0.

Following the transfer of the office of the Alien Property Custodian to the Department of Justice, § 9 (e) received a slight amendment on August 24, 1937. (50 Stat. 748.) See note 4 *supra*. Additional responsibility under the Act was placed upon the Attorney General or the Assistant Attorney General in charge of Claims on May 15, 1939. Executive Order 8136, 4 Fed. Reg. 2044. On April 10, 1940, the President issued Executive Order 8389, 5 Fed. Reg. 1400, which, under authority of § 5 (b), extended control over property in which Norway or Denmark or any national thereof had an interest. This action was confirmed and further supplemented by the Act of May 7, 1940 (54 Stat. 179). This was substantially extended to many other nations by Executive Order 8785, June 14, 1941, 6 Fed. Reg. 2897; Proclamation No. 2497, July 17, 1941, 6 Fed. Reg. 3555; Executive Order 8832, July 26, 1941, 6 Fed. Reg. 3715; Executive Order 8839, July 30, 1941, 6 Fed. Reg. 3823; Executive Order 8900, September 15, 1941, 6 Fed. Reg. 4795; Executive Order 8963, December 9, 1941, 6 Fed. Reg. 6348.

On December 18, 1941 came the First War Powers Act. 55 Stat. 839. No statutory or executive action was needed to make the machinery of the Trading with the Enemy Act available. It was already in effect with the full statutory powers of the Alien Property Custodian vested in the Attorney General. Title III of the First War Powers Act expressly recognized the Trading with the Enemy Act by amending only § 5 (b) of it. Congress also confirmed all actions already taken "under the Trading with the Enemy Act" which would have been authorized "if the provisions of this Act [First War Powers Act] and the amendments made by it had been in effect."

On March 11, 1942, the President issued Executive Order 9095, 7 Fed. Reg. 1971, establishing in the Office for Emergency Management of the Executive Office of the President, the Office of Alien Property Custodian, at the head of which there again would be an Alien Property Custodian appointed by the President. By Executive Order 9142, April 21, 1942, 7 Fed. Reg. 2985, expressly acting under the Constitution and laws of the United States, and in particular under Title I of the First War Powers Act, the President transferred "for the continuance of the present war and for six months after the termination thereof" to "the Alien Property Custodian provided for by Executive Order No. 9095," everything that had been transferred to the Attorney General by Executive Order 6694 of May 1, 1934, or to the Assistant Attorney General in charge of the Claims Division of the Department of Justice under Executive Order 8136, May 15, 1939, 4 Fed. Reg. 2044.

On July 6, 1942, Executive Order 9095 was amended by Executive Order 9193, 7 Fed. Reg. 5205. The Alien Property Custodian "provided for by Executive Order No. 9095," as amended by Executive Order 9193, was thus given the powers of the Trading with the Enemy Act as fully as in World War I and also additional powers pro-

vided through amendments including the expansion of powers under § 5 (b). These authorizations carried power to issue regulations particularly in connection with the vesting of property as was done by the vesting orders in this case.[10] The Alien Property Custodian, in taking over the administration of the Trading with the Enemy Act, is entitled to the full scope of its permanent provisions whether found in § 5 (b) or § 9 (a) or elsewhere.

For these reasons, § 9 (e) does not present a ground for dismissal of the complaint which depends upon § 9 (a) and the decision of the Circuit Court of Appeals should be affirmed.

MR. JUSTICE FRANKFURTER, having concurred in the Court's opinion, also joins in these views.

---

[10] "Without limitation as to any other powers or authority of the Secretary of the Treasury or the Alien Property Custodian under any other provision of this Executive Order, the Secretary of the Treasury and the Alien Property Custodian are authorized and empowered, either jointly or severally, to prescribe from time to time, regulations, rulings, and instructions to carry out the purposes of this Executive Order." Sec. 4, Executive Order 9193, July 6, 1942, 7 Fed. Reg. 5205. See also, provisions of the Vesting Orders as to notice of claims against the property involved in this proceeding.

Each of the Vesting Orders cited in the Court's opinion provides: "Any person, except a national of a designated enemy country, asserting any claim arising as a result of this order may file with the Alien Property Custodian a notice of his claim, together with a request for a hearing thereon, on Form APC–1, within one year from the date hereof, or within such further time as may be allowed by the Alien Property Custodian. Nothing herein contained shall be deemed to constitute an admission of the existence, validity or right to allowance of any such claim." The amended complaint in this case alleges, "A notice of this claim dated and verified January 19th, 1943, was filed with the Alien Property Custodian on or about that date and by him assigned the number F–38–98–1. An amended and supplemental notice of the claim dated and verified May 1st, 1944, has, at the suggestion of the Alien Property Custodian, been executed and filed and a new number, to wit, 280 has been assigned thereto."