William **GREENBLATT** and Peter N. Salzarulo, as Chairman and Co–Chairman, respectively and Trustees of the Joint Industry Board of the Plumbing Industry of the City of New York and Funds Administered by Joint Industry Board of the Plumbing Industry of the City of New York, Peter N. Salzarulo, in his capacity as President of Local Union No. 2 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO, Peter N. Salzarulo, Individually and Local Union No. 2 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO, Plaintiffs,

v.

**DELTA PLUMBING & HEATING CORP.** and New York Surety Company, Defendants.

No. 89 Civ. 7759 (RWS).

United States District Court, S.D. New York.

April 9, 1993.

**624**

Kaming & Kaming, New York City (Joseph S. Kaming, Elizabeth C. Kaming, of counsel), for plaintiffs.

Hollander & Groner, P.C., New York City (Michael R. Strauss, of counsel), for defendant New York Sur. Co.

## OPINION

SWEET, District Judge.

The Plaintiffs, guardians of various Employee Retirement Income Security Act of 1974 (ERISA) Funds (the Joint Industry Board of the Plumbing Industry of the City of New York ("Plumbing Industry Board"), Local Union No. 2 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO ("Local Union No. 2") and William Greenblatt and Peter N. Salzarulo, as officers and trustees of the Plumbing Industry Board), brought suit in this Court against Delta Plumbing and Heating Corporation ("Delta") on November 30, 1989, and added the New York Surety Company ("New York Surety") as a named defendant in May, 1990. Delta sought protection from its creditors by filing a voluntary petition in bankruptcy in March, 1991, automatically staying the action against it pursuant to 11 U.S.C. § 362, leaving New York Surety as the sole defendant. In June, 1991 the Plaintiffs brought suit against New York Surety in the New York State Supreme Court.

Defendant New York Surety has moved to dismiss the instant complaint pursuant to the Federal Rules of Civil Procedure, Rule 12(b)(1) on the ground that the Court lacks jurisdiction over the subject matter of the Plaintiffs' claims against New York Surety. For the reasons given below, the motion is denied.

### The Complaint

The Plaintiffs' suit alleges claims under the ERISA, 29 U.S.C. § 1001 *et seq.*, the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 152 *et seq.*, and pendent state-law claims, stemming from a one-page agreement Delta signed with the Plaintiffs on March 7, 1978 to abide by a collective bargaining agreement (the "Agreement"). The Agreement itself is between the Plumbers Local No. 2 United Association and the Association of Contracting Plumbers of the City of New York, dated June 30, 1976. Article 2 of the Agreement itself, which the Court may consider since the Plaintiffs attached it as integral to their complaint (*see Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir.1991)), requires each employer of the Plaintiffs to make timely payments to the Plumbing Industry Board for fringe benefits, supplemental benefits and contributions. Article 3 of the Agreement requires each employer under the terms of the Agreement to furnish a bond "to the benefit of the Joint Plumbing Industry Board to guarantee the payment of the Fringe Benefits herein mentioned, Security Benefits and any and all other benefits and contributions."

Delta secured its obligations with a bond from New York Surety, which was not a signatory to the Agreement between Delta and the Plaintiffs. Delta subsequently defaulted on its obligations under the Agreement, and by November 20, 1989, the Plumbing Industry Board alleged that Delta owed it some $96,000 plus interest in unpaid fringe benefits.

### Discussion

It is axiomatic that every cause of action in a federal court must have a jurisdictional

basis. The assertion of federal jurisdiction must meet both a constitutional and a statutory standard: the claim must be within the scope of Article III, and Congress must have exercised its constitutional authority to confer jurisdiction on the federal courts. *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 372, 98 S.Ct. 2396, 2401–02, 57 L.Ed.2d 274 (1978). The Plaintiffs have alleged that this Court has direct federal question jurisdiction over New York Surety since New York Surety is an "employer" under ERISA and that, in any event, this Court has "pendent party" jurisdiction over their state-law claims against New York Surety under *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

### The Definition of "Employer" Under ERISA

Although the Plaintiffs allege only contract claims against New York Surety in their Amended Complaint, in their Memorandum of Law they state that the Amended Complaint pleads direct subject matter jurisdiction. They allege that subject matter jurisdiction is granted to this court by Section 515 of ERISA (29 U.S.C. § 1145) that employers make good delinquent contributions:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

The definition of an ERISA "employer" given in Section 3, 29 U.S.C. § 1002:

> (5) The term "employer" means any person acting directly as an employer, or indirectly in the interest of an employer in relation to an employee benefit plan.

The Plaintiffs allege that New York Surety comes under the definition of employer because it is "a signatory to certain collective bargaining obligations as presented in the bond" between it and Delta (Pl. Mem. at 4), since "[t]he collective bargaining agreement is incorporated as part of the Bond." The

relevant section of the Bond as quoted by the Plaintiffs reads:

> .... if the Principal [Delta] shall pay to the Obligee [the Plaintiffs] (1) an amount equal to all required fringe benefits under the Collective Bargaining Agreement on all classifications of employees covered thereunder ... which amounts shall be due to the Obligee during the term of said Agreement ... Then this obligation shall be void....

Pl. Mem. at 5.

The Plaintiffs' argument has been rejected in the Ninth and the Eleventh Circuits, *see Carpenters Southern Cal. Admin. Corp. v. D & L Camp Const.,* 738 F.2d 999, 1000–01 (9th Cir.1984) (also rejecting pendent party jurisdiction over the claim); *Carpenters Southern Cal. Admin. Corp. v. Majestic Housing,* 743 F.2d 1341, 1346 (9th Cir.1984); *Xaros v. U.S. Fidelity and Guar. Co.,* 820 F.2d 1176, 1180 (11th Cir.1987); *Local 938 Joint Health & Welfare Trust Fund v. B.R. Starnes Co.,* 827 F.2d 1454 (11th Cir.1987); *Giardiello v. Balboa Insurance Co.,* 837 F.2d 1566, 1569 (11th Cir.1988), on the grounds that a surety, not being a signatory to the collective bargaining agreement, cannot be an employer under ERISA of the unionized workers. The issue has not arisen for consideration in this Circuit.

Regardless of the cases cited above, the Plaintiffs' position is adopted. Based on the reasoning in these cases, the Defendants make three arguments: that sureties have not been named as employers either in the legislative history or in the statute, that the sureties cannot be liable for obligations in the collective bargaining agreement without being signatories, and that sureties do not bond the employers' obligation solely for the benefit of the employees. This Court is not persuaded by the first two, and in this instance the third does not seem to apply.

The argument based on legislative history is put most succinctly by the court in *Xaros:*

> Neither the legislative history of ERISA, *see* 1974 U.S.Code Cong. & Adm.News 4639, nor of its 1980 amendments, *see* 1980 U.S.Code Cong. & Ad.News 2918, indicate that Congress meant to expand the concept of employer or the jurisdiction of the

federal courts to include sureties, whose obligations are fixed by contract. . . . *Xaros*, 820 F.2d at 1179. While nothing in the legislative history directly expands federal jurisdiction under ERISA over private sureties, nothing in the legislative history excludes them either. Congress enacted ERISA in 1974 to regulate employers' pension plans in order to ensure that employees would receive their vested retirement benefits. *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361–362, 374–375, 100 S.Ct. 1723, 1726–1727, 1732–1733, 64 L.Ed.2d 354 (1980); *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 510–511, 101 S.Ct. 1895, 1899–1900, 68 L.Ed.2d 402 (1981). *Nachman* describes ERISA as a "comprehensive and reticulated" statute:

> Title I of ERISA, § 2 *et seq.*, 29 U.S.C. § 1001 *et seq.*, requires administrators of all covered pension plans to file periodic reports with the Secretary of Labor, mandates minimum participation, vesting and funding schedules, establishes standards of fiduciary conduct for plan administrators, and provides for civil and criminal enforcement of the Act. Title II, ERISA § 1001 *et seq.*, amended various provisions of the Internal Revenue Code of 1954 pertaining to qualification of pension plans for special tax treatment. . . . Title III, ERISA § 3001–3043, 29 U.S.C. § 1201 *et seq.*, contains provisions designed to coordinate enforcement efforts of different federal departments. . . . Title IV, ERISA §§ 4001–4082, 29 U.S.C. § 1301 *et seq.*, created the Pension Benefit Guaranty Corporation (PBGC) and a termination insurance program. . . .

*Nachman*, 446 U.S. at 361, n. 1, 100 S.Ct. at 1726, n. 1. In *Nachman*, an employer closed its plant and "terminated the pension plan covering the persons employed at that plant on December 31, 1975, the day before ERISA would have required significant changes. . . ." *Id.* at 365, 100 S.Ct. at 1728. Although the employees' benefits had vested in the contractual sense, the assets in the fund were sufficient to pay only about 35% of the vested benefits. The employer argued that written limitations of liability in the plan (which would have had to be changed after December 31) prevented the benefits at issue from being characterized as "nonforfeitable" under Title IV and therefore could not be insured by ERISA. The court rejected this argument as a distortion of Congressional intent in enacting ERISA, holding instead that specific terms should be interpreted to support the purpose of the statute.

The legislative history referred to by *Xaros*, especially the 1980 amendments to ERISA which included what became 29 U.S.C. § 1145 (Pub.L. 93–406, Title I, § 515, as added Pub.L. 96–364, Title III, § 306(a), Sept. 26, 1980, 94 Stat. 1295) reflect a desire to strengthen the provisions of ERISA and protect the benefits offered by ERISA-covered plans. The 1980 amendments included a policy statement, enacted as 29 U.S.C. § 1001a, which explicitly declared the policy of ERISA was to foster the maintenance and growth of multiemployer pension plans and to provide reasonable protection for their beneficiaries. The House Report which recommended the bill justified it on these terms:

> The statement of policy included in ERISA does not specifically provide that ERISA is for the purpose of encouraging the growth and maintenance of multiemployer plans.
>
> The policy of the bill, as declared therein, is to make specified changes in the pension rules applicable to multiemployer plans (1) to protect the interests of participants and beneficiaries in financially distressed multiemployer plans and (2) to encourage the growth and maintenance of multiemployer plans.

House Report No. 96–869, Part II, at 12, *reprinted in* 1980 U.S.Code Cong. & Adm. News 2918, 3002.

Section 306(a) of the MPPAA[1] was not individually considered in the excerpts of legislative history collected in 1980 U.S.Code Cong. & Adm.News, although it was considered by the Senate Committee on Labor and Human Resources. Congress enacted § 515 along with the statutory scheme of the

---

1. The Multiemployer Pension Plan Amendment Act of 1980, Pub.L. 96–364, 94 Stat. 1295, 29 U.S.C. § 1381 *et seq.* (1982) ("MPPAA")

MPPAA as another part of its stated purpose in bolstering employee benefit plans. As the Senate Committee explained:

> Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously.... The public policy of this legislation to foster the preservation of the private multiemployer plan system mandates that provision be made to discourage delinquencies and simplify delinquency collection. The bill imposes a Federal statutory duty to contribute on employers that are already contractually obligated to make contributions to multiemployer plans.... The intent of this section is to promote the prompt payment of contributions and assist plans in recovering the costs incurred in connection with delinquencies.

Senate Committee on Labor and Human Resources, 96th Cong., 2d Sess., 44 (Comm. Print 1980), *quoted in Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 94 & n. 3, 102 S.Ct. 851, 865 & n. 3, 70 L.Ed.2d 833 (1982) (Brennan, J. dissenting) (holding underlying illegality of contract is defense to enforcement actions for employee benefits plan). In short, while it is technically true that nothing in the legislative history explicitly grants jurisdiction over sureties, the better interpretation of the law would support Congress' intention of allowing prompt and effective collection of unpaid benefits.

The second argument is that, despite the language of "employer or in the interests of an employer," only a direct signatory to the collective bargaining agreement is an employer according to the definition in 29 U.S.C. § 1002(5). As the Court put it in *Xaros,*

> We hold that nonsignatory subcontractors and sureties are not employers as denied in section 1002(5) of ERISA and as incorporated into section 1145 of the Act, thereby precluding federal subject matter jurisdiction over claims against these nonsignatories for a signatory's failure to make contributions to employee benefit plans. To hold otherwise would constitute an unwarranted departure from the language of,

and intent underlying, sections 1002(5) and 1145.

*Xaros,* 820 F.2d at 1180.

The preceding discussion of legislative history and legislative intent was designed to show that extending ERISA to cover sureties would not be in violation of the Act, since such an extension would further its stated purposes of swift and sure payment of benefits. This passage in the court's opinion in *Xaros,* and corresponding passages in the cases which follow it, however, refers to another argument grounded in the language of the two statutes. *Xaros* holds that the definition of employer, expanded in § 1002(5) to include anyone acting "in the interests of an employer" is actually limited only to those who are "obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement," according to Section 1145. This assumes that only a signatory to a collective bargaining agreement can be obligated to make contributions under its terms.

The Plaintiffs here argue that New York Surety, in bonding the contract, became a signatory to "certain collective bargaining obligations as presented in the bond," and therefore made itself liable for its commitment directly to the Joint Plumbing Industry Board. The Defendants dispute this, arguing that the Plaintiffs are wrongly attempting "to parlay the designation of 'signatory' to the bond a collective bargaining 'obligation,' into signatory status under ERISA." Def. Repy Mem. at 7.

ERISA by its terms does not require signatory status. The statutory language does not limit obligations to signatories to the agreement: Section 1145, when put together with the definition of employer in Section 1002(5), simply states that anyone acting in the interests of an employer who is required to contribute under the terms of the collective bargaining agreement must pay. If the statute turned on the issue of a signature, there would be little reason to include the phrase "acting in the interest of" an employer in Section 1002(5). New York Surety agreed to pay the obligations of Delta if Delta did not pay; under its own bond, then,

New York Surety obligated itself to contribute according to some, if not all, of the terms of the collective bargaining agreement. Section 1145 does not require a party acting in the interests of an employer to be a signatory or to subscribe to all the provisions of the collective bargaining agreement, merely to have promised to make contributions according to the "terms" of the collective bargaining agreement.

 This is a permissible construction of the statute. Where the language of a statute is clear, a court may follow it, provided that such a literal reading of a statutory term does not compel an odd result. *Public Citizen v. Dept. of Justice*, 491 U.S. 440, 454, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377 (1989). Here, although defining a surety as an employer obligated to pay *is* a reading of the statute not explicitly contemplated by Congress, reading Section 1145 in this way furthers the purpose of the statute. The surest guide to the meaning of a statute may be an understanding of its objectives, but where the statute is clear, "the words used, even in their most literal sense, are the primary, and ordinarily the most reliable source of interpreting the meaning of any writing," *id.*, quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945) (Hand, J.).

Given the Congressional intent to protect benefits evident in the legislative history, in this instance the plain meaning of the statute should control. A different set of circumstances would compel a different conclusion. For example, the Second Circuit has construed the term "employer" under the MPPAA in Title IV of ERISA in order to effectuate the purpose of the statute, broadly enough to include parties who were not signatories to the collective bargaining agreement and who, the Court conceded, would not qualify as common-law employers. *Korea Shipping Corp. v. New York Shipping Ass'n*, 880 F.2d 1531, 1537 (2d Cir.1989); *Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258 (2d Cir.1990). Although the Second Circuit found that the Section 1002(5) definition of "employer" does not by its terms apply to the MPPAA (*Korea Shipping*, 880 F.2d at 1536), the court found

the statutory definition in ERISA useful in formulating a test of "continuing obligation" to apply to an employer. In the MPPAA, although the "plain meaning" of the term "employer" suggested a common-law employer, the policies and purposes of the statute did not.

However, in this instance the plain meaning and the goals of the statute do not conflict. The best way to effectuate the purposes of Section 1145 under these circumstances is to admit the statute means what it says: since the language of the statute does not restrict the definition of "employer" to parties which have signed the collective bargaining agreement, the courts should not do so. This "plain meaning" view of statutory interpretation has been advocated in certain recent Supreme Court and Second Circuit opinions, *see, e.g., Ardestani v. INS*, — U.S. —, —, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991); *Union Bank v. Wolas*, — U.S. —, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991); *United States v. Koehler*, 973 F.2d 132, 134 (2d Cir.1992), especially those opinions written by Justice Antonin Scalia. The "plain meaning" theory of statutory interpretation is dangerous precisely because it can be used to frustrate Congressional purpose, and much of the criticism of "plain meaning" focuses on this. *See, e.g.,* James L. Oakes, Arps Memorial Lecture before the Association of the Bar of the City of New York 15 (Nov. 18, 1992) ("my main point is that the plain-meaning approach to statutory interpretation can, and frequently does, pay insufficient deference to the Congressional will"); William N. Eskridge, Jr., *Overriding Supreme Court Statutory Interpretation Decisions*, 101 Yale L.J. 331 (1991). However, where the plain meaning of a statute will serve its purpose, these concerns do not apply, and both the legislative intent and a permissible reading of the plain language of the statute bring New York Surety within the reach of Section 1145 as one acting "in the interest of an employer in relation to an employee benefit plan."

In the Ninth Circuit's opinion in *Carpenters*, the court held that the sureties were not acting "in the interest of an employer" because the surety's bond was in the interests

of employees hurt by the employer's inability or refusal to pay. *Carpenters,* 738 F.2d at 1001. However, *Carpenters* and the other California cases following it were decided in the light of the California contractor licensing statute (Cal.Bus. & Prof.Code § 7071.5) which required projects such as the one in *Carpenters* to be bonded. *Xaros,* in turn, relied on the California cases. This implicates a different issue: "Even if the employer's liability to the plaintiff were established, the claim against the surety could create a galaxy of problems arising under California law," including compliance with various other California statutes and the union's position in relation to the claims of other claimants on the bond. *Carpenters,* 738 F.2d at 1000. The court in *Xaros* did not say whether the surety bond was required by Florida law or by the collective bargaining agreement, but it essentially relied on *Carpenters* to hold that a surety acts only in the interests of the employer and not of the employees. *Xaros,* 820 F.2d at 1180.

Here, the evidence put before this Court suggests only that Delta bonded its pension obligations because the Agreement required it to take out a surety bond "to the benefit of the Joint Plumbing Industry Board." New York Surety thereby became a person acting indirectly in the interest of the employer since without the bond there would have been no agreement between Delta and Local Union No. 2. The surety bond, purchased by the employer, was a benefit to both Delta and the Plaintiffs, but it was required by the Plaintiffs in the Agreement long before Delta signed on to the terms of the contract to ensure the payments of benefits to the unionized workers.

Compliance with the requirement obviously benefited the employees but also the employers who sought the benefits of the Agreement. There is nothing in the language of the statute or the lobby behind it as set forth in the legislative history which requires the holding in *Carpenters,* that the indirect benefit to the employees be exclusive or rendered the exclusive effect of the language nugatory by serving as a benefit to the employer as well.

### *Pendent Party Jurisdiction*

The Plaintiffs also allege that this court has "pendent party" jurisdiction as well as direct subject-matter jurisdiction under ERISA. Because the Plaintiffs' original complaint was filed on November 1990 and amended May 1990, it is not governed by the Judicial Improvements Act of 1990, Pub.L. 101–650, § 310, 104 Stat. 5113, *codified in* 28 U.S.C. § 1367 (West Supp.1992). The Act, which codified the concepts of ancillary and pendent jurisdiction under the caption of "supplemental jurisdiction," applies only to actions commenced on or after the date of its enactment, which was December 1, 1990.

Federal courts have "pendent jurisdiction" over state law claims relating to a federal action provided that the "entire action before the court comprise[ ] but one constitutional 'case,'" and the federal and pendent claims "derive from a common nucleus of operative fact" such that a plaintiff "would ordinarily be expected to try them in one judicial proceeding." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). *See United States v. A & N Cleaners & Launderers, Inc.,* 747 F.Supp. 1014, 1016–17 (S.D.N.Y. 1990). "There is little, if any, debate over the federal courts' power to exercise pendent claim jurisdiction, provided that the federal claims are not frivolous on their face" and the *Gibbs* test is met. *Huffman v. Hains,* 865 F.2d 920, 922 (7th Cir.1989)

Pendent party jurisdiction refers to a court's assertion of "jurisdiction over parties not named in any claim that is independently cognizable by the federal court," *Finley v. United States,* 490 U.S. 545, 549, 109 S.Ct. 2003, 2006, 104 L.Ed.2d 593 (1989), in contrast to pendent claim jurisdiction, which refers to pendent state claims consolidated with the federal claims between parties already in federal court. Once the context or posture of the federal claim was established, *Finley* held, pendent party jurisdiction was conferred by the text of the federal statute:

> The second factor ... the text of the jurisdictional statute at issue, likewise fails to establish petitioner's case. The FTCA, § 1346(b), confers jurisdiction over "civil

actions on claims against the United States." It does not say "civil actions on claims that include requested relief against the United States," nor "civil actions in which there is a claim against the United States"—formulations one might expect if the presence of a claim against the United States constituted merely a minimum jurisdictional requirement.... What is of paramount importance is that Congress be able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts.

*Finley,* 490 U.S. at 552, 556, 109 S.Ct. at 2008, 2010. According to *Finley,* the grant of jurisdiction which allows pendent party claims must be found in the language of the statute.

▇ The Second Circuit considered the effect of statutory language in granting pendent party jurisdiction after *Finley* in *Roco Carriers, Ltd. v. M/V Nurnberg Express,* 899 F.2d 1292 (2d Cir.1990). *Roco* was a case in admiralty, and jurisdiction over the state-law claim against a new party hinged upon the interpretation of 28 U.S.C. § 1333(1), which confers jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." The court held that since the phrase "any civil case" did not "contain a limitation as to a certain category of parties" nor "to a certain category of claims," it had pendent party jurisdiction because

the statute providing admiralty jurisdiction is strikingly broad: it confers exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction," 28 U.S.C. § 1333(1).

The importance of this last distinction is illustrated by a comparison of cases in other circuits decided in the wake of *Finley....*

*Roco,* 899 F.2d at 1296. Among the cases the court cited with approval was *Iron Workers Mid–South Pension Fund v. Terotechnology Corp.,* 891 F.2d 548, 551 (5th Cir.), *cert. denied sub. nom. Iron Workers Mid–South Pension Fund v. Borden Chemical,* 497 U.S. 1024, 110 S.Ct. 3272, 111 L.Ed.2d 782 (1990), which found that § 502(e) of ERISA did not confer pendent party jurisdiction on the court.

In *Iron Workers,* the plaintiffs, unions' funds and their fiduciaries, sued a number of parties seeking to enforce the liens recorded against the Geismar plant for fringe benefit contributions and dues owed by the defendant employer, Terotechnology Corporation. One of these parties was Borden Chemical, which had entered into a plant maintenance services contract with Terotechnology for work to be performed at the Geismar plant. The Court in *Iron Workers* held that the Plaintiffs' claim of pendent jurisdiction "is not correct in light of the Supreme Court's recent decision in *Finley." Id.* at 550. It construed the statutory language in ERISA to deny pendent party jurisdiction:

ERISA § 502(e), 29 U.S.C. § 1132(e), provides that "... the district courts of the United States shall have exclusive jurisdiction of civil actions *under this subchapter* brought by ... [a] fiduciary" (emphasis added). ERISA does not authorize suits against property owners to enforce liens against the property to aid collection of delinquent contributions, however, so there is no statutory grant of jurisdiction over parties such as Borden.

*Id.,* at 551.

Although the claims of the Plaintiffs are apparently still governed by *Finley* and *Iron Workers,* other circuits have found those cases no longer persuasive:

*Iron Workers* was correctly operating under the principle announced in *Finley* that pendent party jurisdiction does not exist, unless Congress has expressly spoken to allow it ... Congress has now spoken.... The clear intent of Congress, as illustrated in § 1367, prompts us to agree that it would make no sense to give an expansive reading to *Finley* to reach a result that Congress has deliberately repudiated for future cases.... Since the doctrinal underpinning of *Finley* have been abolished by statute, the continued validity of *Iron Workers,* a case directly based on the mandate of *Finley,* is questionable.

*Rodriguez v. Pacificare of Texas, Inc.,* 980 F.2d 1014 (5th Cir.1993) (citations and quotations omitted) (district court's exercise of pendent party jurisdiction over cause of ac-

tion arising under ERISA not reversible error). However, based upon *Iron Workers* as interpreted by *Rodriguez,* there is no pendent party jurisdiction over the Plaintiffs' claim filed against New York Surety prior to December 1, 1990.

*Conclusion*

For the reasons stated above, the Defendant's motion to dismiss based on lack of subject-matter jurisdiction is hereby denied. Since this Court does not have "pendent party" jurisdiction under the circumstances as they exist now, there is no need to address the argument over whether the automatic stay and severance of Delta from the action affects the issue of jurisdiction.

It is so ordered.