CHERRY–BURRELL CORPORATION,
Appellant,

v.

UNITED STATES of America,
Appellee.

No. 18110.

United States Court of Appeals
Eighth Circuit.

Oct. 5, 1966.

Rehearing Denied Dec. 7, 1966.

Paul A. Teschner, of Pope, Ballard, Uriell, Kennedy, Shepard & Fowle, Chicago, Ill., for appellant. Frank H. Uriell, Chicago, Ill., was with him on the brief.

Edward Lee Rogers, Atty., Dept. of Justice Washington, D. C., for appellee. C. Moxley Featherston, Acting Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Tax Division, Washington, D. C., and Donald E. O'Brien, U. S. Atty., Sioux City, Iowa, were with him on the brief.

Before JOHNSEN and BLACKMUN, Circuit Judges, and YOUNG, District Judge.

BLACKMUN, Circuit Judge.

This action for refund of corporate income taxes paid for fiscal years ended October 31, 1955 and 1956 concerns the tax-free distribution provisions of § 112 (b) (6) (A) and (D) and (i) [1] of the In-

---

1. § 112 Recognition of gain or loss—

(a) General rule. Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) * * *

(6) Property received by corporation on complete liquidation of another. No gain or loss shall be recognized upon the receipt by a corporation of property distributed in complete liquidation of another corporation. For the purposes of this paragraph a distribution shall be considered to be in complete liquidation only if—

(A) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 per centum of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), and was at no time on or after the date of the adoption of the plan of liquidation and until the receipt of the property the owner of a greater percentage of any class of stock than the percentage of such class owned at the time of the receipt of the property; and * * *

ternal Revenue Code of 1939 and the impact of intervening ligation upon the three-year requirement of that section. There appears to be little helpful precedent.

The facts are established in their entirety by a stipulation and the exhibits which accompany it. They are not in controversy. The issue, therefore, is one of law.

The taxpayer, Cherry-Burrell Corporation, is a Delaware corporation which files its federal income tax returns on the accrual basis and for the fiscal year ended October 31. For some time prior to March 1952 the taxpayer owned all (2800) the outstanding preference shares and 80% of the ordinary or common shares of Cherry-Burrell Limited, an English corporation, which we shall call "Limited". The other 20% of the ordinary shares were held by the then managing director of Limited.

In November 1951 the Commissioner of Internal Revenue issued a letter-ruling that the liquidation of Limited proposed by the taxpayer was "not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes", within the meaning of § 112(i). This meant that Limited could be "considered as a corporation" under § 112(b)(6).

On March 10, 1952, Securities Agency Limited, an English corporation having no relationship to the taxpayer, acquired those ordinary shares of Limited theretofore held by the managing director.

On March 12 Limited's board adopted a resolution for the sale of that company's assets to Securities Agency Limited on behalf of Clarke-Built Limited, another English corporation, for 188,110 English pounds. Limited's shareholders met five days later and voted to wind up the company voluntarily in accordance with the provisions of § 278 et seq. of the English Companies Act of 1948, 11 & 12 Geo. 6, c. 38. They appointed V. L. Norris, the then London partner of taxpayer's retained accounting firm, as Liquidator of the company under § 245 of that Act.

The shareholders of Limited, including the taxpayer, forwith surrendered their share certificates to the Liquidator. The buyer promptly paid the full purchase price. On March 17, 1952, this payment was deposited in the London branch of a New York bank, subject to withdrawal by Norris as Liquidator, under the account name "Cherry-Burrell Limited (In Liquidation)". The taxpayer, also in March, agreed to hold Norris harmless with respect to claims arising out of his acting as Liquidator. It also guaranteed

(D) such distribution is one of a series of distributions by such other corporation in complete cancellation or redemption of all its stock in accordance with a plan of liquidation under which the transfer of all the property under the liquidation is to be completed within three years from the close of the taxable year during which is made the first of the series of distributions under the plan, except that if such transfer is not completed within such period, or if the taxpayer does not continue qualified under subparagraph (A) until the completion of such transfer, no distribution under the plan shall be considered a distribution in complete liquidation. If such transfer of all the property does not occur within the taxable year the Commissioner may require of the taxpayer such bond, or waiver of the statute of limitations on assessment and collection, or both, as he may deem necessary to insure, if the transfer of the

property is not completed within such three-year period, or if the taxpayer does not continue qualified under subparagraph (A) until the completion of such transfer, the assessment and collection of all income, war-profits, and excess-profts taxes then imposed by law for such taxable year or subsequent taxable years, to the extent attributable to property so received. * * *

(i) Foreign corporations. In determining the extent to which gain shall be recognized in the case of any of the exchanges described in subsection (b) * * * (6) * * * a foreign corporation shall not be considered as a corporation unless, prior to such exchange, it has been established to the satisfaction of the Commissioner that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

payment by the Liquidator to Securities Agency Limited of a designated amount per share for its minority holding in Limited.

The Liquidator learned, and advised taxpayer, of the existence of substantial claims against Limited. These had been known to Limited's managing director and not to the taxpayer. On April 4 the Liquidator paid taxpayer £2800 as a distribution in full on the preference shares of Limited. On April 7 he distributed £146,250 on the ordinary shares. Of this amount £117,000 was paid to the taxpayer and £29,250 to the minority shareholder. These 1952 payments to the taxpayer were shown as receipts in its books for fiscal 1952. Because of the claims which were being asserted against Limited, Norris retained at that time a balance of approximately £39,000 in the London bank account.

About the end of March 1953 Clarke-Built Limited instituted suit in the High Court of Justice, London, against Limited and the taxpayer for declaratory and injunctive relief and damages. The defendants in that suit in due course filed their common Defence and Counterclaim. In January 1954 the Liquidator transferred £31,000 of the £31,218.15.8 then remaining in the liquidating account to the "Companies Liquidating Account" in the Bank of England. This transfer of funds to that bank was specifically required by § 343(1) of the Companies Act.[2]

In May 1955 the last of the claims, other than the Clarke-Built lawsuit, asserted against Limited was settled. In August 1958, approximately six years and four months after the April 1952 distributions had been made, the parties to the Clarke-

Built lawsuit agreed on settlement terms. Documents were sealed on September 29, 1958, and the action was withdrawn. The Liquidator made his final payment in October to Limited's ordinary shareholders. This amounted to £7800 for the minority shareholders pursuant to the taxpayer's guaranty, and £18,156.16.8 (or $55,157.-67) for the taxpayer. The latter amount was shown as a receipt in the taxpayer's books for fiscal 1958.

It is particularly stipulated that

"Under British law, Mr. Norris was unable to pay out to the shareholders of Cherry-Burrell Limited the balance of the funds withheld by him as Liquidator until disposition of all claims against Cherry-Burrell Limited, including the Clarke-Built Limited lawsuit."

Interest accrued on the fund held by the Liquidator from 1952 to 1958. None of this interest was reported by the taxpayer for federal income tax purposes; British income tax, however, was paid upon it.

Taxpayer's fiscal 1952 and 1958 returns did refer to Limited's liquidation and to receipts thereunder, but did not reflect the receipts as income. Taxpayer's returns for its fiscal years 1953–57, inclusive, contained no information or reference to Limited or its liquidation.

The taxpayer did not file with its return for any of the fiscal years 1952–58, inclusive, any waiver of assessment or any bond of the kind described and required by Treas.Regs. 118 § 39.112(b)(6)–3(2) and (3) (1953), and by Treas. Regs. § 1.332–4(a) (2) and (3) (1954).

The taxpayer's fiscal 1958 return as filed showed a loss of $746,664.02 and no

---

**2. 343.** Unclaimed assets in England to be paid to Companies Liquidation Account. —(1) If, where a company is being wound up in England, it appears either from any statement sent to the registrar under the last foregoing section or otherwise that a liquidator has in his hands or under his control any money representing unclaimed or undistributed assets of the company which have remained unclaimed or undistributed for six months after the date of

their receipt or any money held by the company in trust in respect of dividends or other sums due to any person as a member of the company, the liquidator shall forthwith pay the said money to the Companies Liquidation Account at the Bank of England, and shall be entitled to the prescribed certificate of receipt for the money so paid, and that certificate shall be an effectual discharge to him in respect thereof.

tax. Upon audit this loss was reduced by the $55,157.67 amount in United States funds which the taxpayer received that year from the Liquidator. This adjustment of course meant that the Internal Revenue Service regarded the distribution as one not entitled to tax-free treatment. Because of the carryback provisions of § 172 of the 1954 Code, the adjustment resulted in asserted income tax deficiencies of $23,720.25 for the taxpayer's fiscal year 1955 and $4,773.85 for its fiscal year 1956. These were paid. The payments were then made the subject of appropriate claims for refund duly filed and disallowed. The present suit is for the recovery of those deficiency payments.

The district court held that the 1958 distribution was one of a series by Limited in complete cancellation or redemption of all its stock in accordance with a plan of liquidation; that, however, the transfer was not completed within three years from the close of the taxable year during which the first of the series of distributions under the plan was made; and that, therefore, the requirements of § 112(b) (6) (D) for tax-free treatment were not fulfilled. Judgment dismissing the action on the merits was entered accordingly. The taxpayer appeals.

■ Although the taxes in controversy here are for years governed by the 1954 Code, § 7851(a) (1) (A) of that Code, the 1939 Code was in effect when the plan of liquidation was adopted in 1952 and controls the plan's tax character. See § 7851(b) of the 1954 Code. In any event, § 112(b) (6) of the 1939 Code and the corresponding § 332(b) of the 1954 Code have no differences which are of significance here.

No question is raised as to the taxpayer's full compliance with all tax-free conditions of § 112(b) (6) (A) and (D) and (i) other than the three-year provision. The requirements as to (a) taxpayer's continuing unchanged percentage ownership of shares of Limited; (b) the distributions' being a complete cancellation or redemption of all Limited's stock; (c) their being made in accordance with an appropriate plan of liquidation; (d) their contemplated completion within three years; and (e) prior establishment that Limited's liquidation did not have avoidance of federal income taxes as a principal purpose, concededly were all satisfied. The issue, thus, is the narrow one of the effect of the Liquidator's not making his final payment of cash to the taxpayer by October 31, 1955, that is, within three years from October 31, 1952, the close of the taxable year during which the first distribution was made.

The government argues that all the activities of the Liquidator here "are typical of the steps usually involved in carrying out the liquidation of a corporation"; that while they are being carried out the liquidation is in progress and has not terminated (citing among others, our year-of-loss case of Northwest Bancorporation v. Commissioner of Internal Revenue, 88 F.2d 293, 296 (8 Cir. 1937)); and that as provided in Treas.Regs. 118 § 39.112(b) (6)–1(d) (1953), "no liquidation is completed until the liquidating corporation and the receiver or trustees in liquidation are finally divested of all the property (both tangible and intangible)". It further argues that distributions here were effected only in 1952 and 1958; that the three-year requirement therefore was not fulfilled; that there is no justification for the taxpayer's not complying with that requirement; and that, in any event, the taxpayer's failure to satisfy the waiver and bond provisions of the regulations disentitles it to tax-free treatment under § 112(b) (6).

■ Provisions for the tax-free receipt by a corporation of property distributed in complete liquidation of another corporation under certain conditions first appeared effectively in the income tax laws of § 112(b) (6) of the Revenue Act of 1936.[3] They also ap-

<hr/>

3. An initial version not applicable to the receipt of money appeared as § 110(a) of the Revenue Act of 1935, which added paragraph (6) to § 112(b) of the Revenue Act of 1934. This addition, however, was applicable only to taxable years

peared as the same numbered section of the Revenue Act of 1938 and then found their way into the 1939 and 1954 Codes. Prior to this, the liquidation of a subsidiary was a transaction on which gain or loss was recognized as in other liquidations. See, for example, Gulf, M. & N. R. R. v. Commissioner of Internal Revenue, 83 F.2d 788, 791 (5 Cir. 1936), cert. denied 299 U.S. 574, 57 S.Ct. 38, 81 L.Ed. 423. The purpose of the new provisions was to facilitate simplification of corporate structures. See Helvering v. Credit Alliance Corp., 316 U.S. 107, 112, 62 S.Ct. 989, 86 L.Ed. 1307 (1942); Granite Trust Co. v. United States, 238 F.2d 670, 675 (1 Cir. 1956); Message of the President to Congress on June 19, 1935, H.Rep.No. 1681, 74th Cong., 1st Sess., p. 4; 80 Cong.Rec. 8799, 9038, 10270, 10288, 10452 (1936).

In Chicago Theological Seminary v. People of State of Illinois, 188 U.S. 662, 672, 23 S.Ct. 386, 387, 47 L.Ed. 641 (1903), Mr. Justice Peckham said:

> "The rule is that, in claims for exemption from taxation under legislative authority, the exemption must be plainly and unmistakably granted; it cannot exist by implication only; a doubt is fatal to the claim."

This was expressed somewhat differently by Mr. Justice Cardozo in Trotter v. Tennessee, 290 U.S. 354, 356, 54 S.Ct. 138, 78 L.Ed. 358 (1933):

> "Exemptions from taxation are not to be enlarged by implication if doubts are nicely balanced. Chicago Theological Seminary v. [People of State of] Illinois, 188 U.S. 662, 674, 23 S.Ct. 386, 47 L.Ed. 641. On the other hand, they are not to be read so grudgingly as to thwart the purpose of the lawmakers."

And Mr. Justice Douglas, in United States v. Stewart, 311 U.S. 60, 71, 61 S.Ct. 102, 109, 85 L.Ed. 40 (1940), noted that "generalized statutory exemptions have frequently been construed narrowly and confined to those situations where the subject matter of the exemption was directly, not indirectly or remotely, involved". See also Commissioner of Internal Revenue, v. Estate of Sternberger, 348 U.S. 187, 190 n. 3, 75 S.Ct. 229, 99 L.Ed. 246 (1955). In Estate of Luehrmann v. Commissioner of Internal Revenue, 287 F.2d 10, 15 (8 Cir. 1961), and in Equitable Life Ins. Co. of Iowa v. United States, 340 F.2d 9, 12 (8 Cir. 1965), this court said that "Tax exemptions and deductions do not turn upon general equitable considerations".

These cases say, we think, that exemption depends upon legislative grace; that it is not present where there is doubt or ambiguity as to the meaning of the statute; that it does not come about by implication; and that legislative purpose is significant.

It has been said, too, that "Taxation is an intensely practical matter, and laws in respect of it should be construed and applied with a view of avoiding, so far as possible, unjust and oppressive consequences". Farmers Loan & Trust Co. v. State of Minnesota, 280 U.S. 204, 212, 50 S.Ct. 98, 100, 74 L.Ed. 371 (1930); Tyler v. United States, 281 U.S. 497, 503, 50 S.Ct. 356, 74 L.Ed. 991 (1930). This court has resolved more than one tax case on that approach. James M. Pierce Corp. v. Commissioner, 326 F.2d 67, 71 (8 Cir. 1964); Lethert v. Culbertson's Cafe, Inc., 313 F.2d 506, 516 (8 Cir. 1963); Carlberg v. United States, 281 F.2d 507, 519 (8 Cir. 1960); Helvering v. Cannon Valley Milling Co., 129 F.2d 642, 647 (8 Cir. 1942); St. Louis Union Trust Co. v. Burnet, 59 F.2d 922, 927 (8 Cir. 1932).

With these general principles in mind, we make two preliminary observations:

1. Despite what is possibly a suggestion in the government brief, we feel that this record would not warrant an inference of bad faith or fraud on the part of the taxpayer. It discloses no gov-

---

beginning after December 31, 1935. § 110(e) of the 1935 Act. The 1936 Act, itself made applicable by its § 1 to taxable years beginning after December 31, 1935, supplanted the 1935–34 version.

ernment request made to the trial court for any such finding and the government at all times has contended that for fiscal 1952 the usual limitation period prescribed by § 275 of the 1939 Code applies rather than the absence of limitation specified by § 275(a) for false or fraudulent return situations. It is true that the taxpayer filed no assessment waiver or bond as authorized by § 112(b) (6) (D) of the 1939 Code and § 332(b) of the 1954 Code and which the respective regulations hereinbefore cited would require. It is also true that the taxpayer made no mention of Limited's liquidation in its returns for the fiscal years 1953–57, inclusive, intervening between the initial payments made by the Liquidator in 1952 and the final one in 1958. On the other hand, no payment was made during those intervening years. And the Internal Revenue Service was advised of Limited's liquidation by the information submitted with the taxpayer's fiscal 1952 return and by the fact of the Commissioner's ruling issued in 1951 with respect to the then proposed liquidation of Limited and § 112(i). The taxpayer presumably was aware of the requirement of the regulations and one may say that the liquidation information submitted with its 1952 return might have been more complete. But this does not add up to fraud.

2. We do not fully understand the significance, if any, of the government's reference in its brief to the wholly cash aspect of this liquidation and consequent "complete tax avoidance". We thought this aspect had been settled long ago. Although the Internal Revenue Service once held that the word "property" in § 112(b) (6) included money, G.C. M. 19435, 1938–1 C.B. 176; although the Board of Tax Appeals first held otherwise, Stimson Mill Co., 46 B.T.A. 141, 143 (1942), aff'd on other grounds and with a specific avoidance of this issue, Commissioner of Internal Revenue v. Stimson Mill Co., 137 F.2d 286, 287 (9 Cir. 1943), but then later the Tax Court reversed itself, International Inv. Corp., 11 T.C. 678, 685 (1948); and although the Service thereafter resisted, it is now established that a cash distribution does not disqualify a taxpayer from the benefits of § 112(b) (6). Tri-Lakes S. S. Co. v. Commissioner of Internal Revenue, 146 F.2d 970, 972 (6 Cir. 1945); Burnside Veneer Co. v. Commissioner of Internal Revenue, 167 F.2d 214, 217 (6 Cir. 1948); International Inv. Corp. v. Commissioner of Internal Revenue, 175 F.2d 772 (3 Cir. 1949); Distributors Fin. Corp., 20 T.C. 768, 780–781 (1953). Judge Friendly has described the effect of all this in J. C. Penney Co. v. Commissioner of Internal Revenue, 312 F.2d 65, 69 (2 Cir. 1962):

"This meant in practical effect that only one tax would be payable on gain from the sale of property incident to liquidation of such a subsidiary, and this irrespective of whether the sale was made by the subsidiary before liquidation or by the parent thereafter. * * * Parent and 80% owned subsidiary were thus freed from one of the two taxes imposed in other cases when sale at a gain preceded liquidation at a gain".

Admittedly, any gain realized by Limited on the 1952 sale of its assets was not subjected to federal income tax but this is due to Limited's British character and British operations. Had it been an American corporation, that gain would have been taxed here. And we are not advised by the briefs, nor can we ascertain with certainty from the record, whether such gain, if any existed, was subjected to British income tax. That detail, however, is of no significance.

Although the issue is not free from doubt and it appears to us to be close, and although there are expressions in some cases susceptible of contrary inferences, see Burnside Veneer Co. v. Commissioner of Internal Revenue, supra, 167 F.2d p. 218 of 167 F.2d ("[T]he statute makes completion within the statutory period mandatory"); George G. Mason, 3 T.C. 1087, 1091 (1944), we find ourselves in disagreement with the trial court. We hold that this taxpayer is entitled to the benefit of § 112(b) (6) of the 1939 Code and that its net operat-

ing loss for fiscal 1958 is not to be reduced by the amount paid to it in that taxable year by Limited's Liquidator. We so conclude because:

1. We feel that we need not concern ourselves with any question of technical title to assets or of formal agency on the part of the Liquidator. The intendment of the statute should not be thwarted by technical niceties. See Burnet v. Wells, 289 U.S. 670, 678, 53 S. Ct. 761, 77 L.Ed. 1439 (1933).

2. As a practical matter, every liquidation step of significance was taken in fiscal 1952. The intent and purpose of both Limited and the taxpayer were clear. All required formal corporate action was taken. Limited's assets were sold in March; thereafter Limited possessed nothing but cash. It had no operating assets. The taxpayer learned of the existence of substantial claims from the Liquidator. Prompt distribution nevertheless was effected of as much of the cash as possible. The preference shareholders were paid off in full. Only such cash was held back as applicable local law demanded. Even the amount so retained was soon deposited by the Liquidator in the Bank of England, as specified by the English statute. In the statutory language, this was "an effectual discharge to him in respect thereof". There was no corporate activity whatsoever in any economic or commercial sense. There was no business operation or anything of the kind to which Rev.Rul. 66–186, 1966–27 I.R.B. 12, has application. The record discloses nothing indicative of purposeful delay in distribution or over-large retention or connivance between the taxpayer or Limited or any claimant. Despite the government's suggestion that the taxpayer was less than diligent in effecting settlement because it had not served a time limit ultimatum upon Clarke-Built, one knows that a claim or a lawsuit cannot be settled unilaterally. Finally, the taxpayer, as a matter of contract, had assumed full liability by way of the protection it afforded to the Liquidator. All this equates with de facto liquidation. See Wier Long Leaf Lum-

ber Co. v. Commissioner of Internal Revenue, 173 F.2d 549, 551, 553 (5 Cir. 1949).

3. The purpose of § 112(b) (6) (D) was fulfilled. The corporate structure was simplified. The statute's three-year period strikes us as being primarily a significant indicator of the genuineness of the plan of liquidation. There is no question as to genuineness here. "All construction is the ascertainment of meaning. And literalness may strangle meaning". Utah Junk Co. v. Porter, 328 U.S. 39, 44, 66 S.Ct. 889, 892, 90 L.Ed. 1071 (1946). See Markham v. Cabell, 326 U.S. 404, 409, 66 S.Ct. 193, 90 L.Ed. 165 (1945); Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226 (1892). Cf. J. F. Anderson Lumber Co., 15 B.T.A. 475, 478 (1929). We do not wish, if we may use Mr. Justice Cardozo's phrase, quoted above, "grudgingly * * * to thwart the purpose of the lawmakers".

4. Only the barrier of the English law prevented what is, at most, technical compliance with the statute's requirements. We are not inclined to impose a forfeiture of tax consequences because of this. If there was noncompliance here, the situation is one of excusable noncompliance and one which fits the maxim *lex non cogit ad impossibilia*. There is more here than the taxpayer's mere inconvenience, as the government suggests.

5. Tax consequences may ensue even though, for one reason or another, a fund's immediate availability to a taxpayer is prevented. A security purpose affords the usual example. See Commissioner of Internal Revenue v. Hansen, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959); Bolling v. Commissioner of Internal Revenue, 357 F.2d 3, 6 (8 Cir. 1966); Estate of Geiger v. Commissioner of Internal Revenue, 352 F.2d 221, 231 (8 Cir. 1965), cert. denied 382 U.S. 1012, 86 S.Ct. 620, 15 L.Ed.2d 527.

6. The governing statute is not without features of flexibility. Thus, it specifically provides that a distribution is

not disqualified "merely because it does not constitute a distribution or liquidation within the meaning of the corporate law under which the distribution is made". Neither is it disqualified "merely because the carrying out of the plan involves" the transfer of property not attributable to the taxpayer's shares in the liquidating corporation, etc. The current regulations under the 1954 Code, § 1.332–2(c), even provide, "Nor will the mere retention of a nominal amount of assets for the sole purpose of preserving the corporation's legal existence disqualify the transaction". Also, although § 112(b) (6) (A) and (D) both speak of "plan of liquidation", the existence of a formal plan has not been held essential; an intention to liquidate may satisfy the statute's requirement as to a plan. Service Co. v. Commissioner of Internal Revenue, 165 F.2d 75, 77–78 (8 Cir. 1948); Burnside Veneer Co. v. Commissioner of Internal Revenue, supra, p. 217 of 167 F.2d.

7. Similar liberality of approach exists with respect to one-month liquidations under § 112(b) (7) of the 1939 Code and § 333 of the 1954 Code. Here, the regulations, Treas.Regs. 118 § 39.112 (b) (7)–1(b) (1) (1953); Treas.Regs. § 1.333–1(b) (1) (1954), provide that the one-month requirement nevertheless "will be considered to have been complied with if cash is set aside under arrangements for the payment, after the close of such month, of unascertained or contingent liabilities and expenses, and such arrangements are made in good faith and the amount set aside is reasonable". See Estate of Lewis B. Meyer, 15 T.C. 850, 860–862 (1950), reversed on other grounds, Meyer's Estate v. Commissioner of Internal Revenue, 200 F.2d 592 (5 Cir. 1952).

8. There is a similar liberality of approach to liquidations under the 12-month provisions of § 337 of the 1954 Code (which, however, had no precise counterpart in the 1939 Code). The statute itself, § 337(a) (2), states that assets may be "retained to meet claims", without disqualification for the statutory

benefit. This of course is carried over into the regulations which provide that the retained assets must be specifically set apart for the payment of claims and be reasonable in amount. Treas.Regs. § 1.337–1 (1954).

9. Finally, we are not impressed with the government's emphasis upon the taxpayer's failure to submit assessment waivers or protective bonds. The government argues that, because of this, the taxpayer should forfeit the non-recognition-of-gain privilege granted by § 112(b) (6). We do not so read the statute. Section 112(b) (6) contains no forfeiture or condition precedent. It merely states that if the transfer does not occur within the taxable year the Commissioner "may require" the bond or waiver, or both, as he deems necessary to protect the revenue. The Commissioner's regulations do call for the waiver and the bond, as we have noted, but even those regulations do not embrace a forfeiture. Had Congress so intended it would have so provided, just as it provided, in § 112(i), for non-qualification of a foreign corporation's liquidation without advance establishment of non-avoidance of federal income tax.

In summary, we hold that where, as here, it is conceded that all conditions of § 112(b) (6) (A) and (D) other than the three-year provision have been satisfied, and where, before the expiration of the three-year period (a) the necessary corporate action by directors and shareholders is taken; (b) all the corporation's assets are sold and converted into cash; (c) a statutory liquidator is appointed; (d) substantial claims then become known to the taxpayer; (e) the preference shares are paid off; (f) the liquidator distributes everything except the amount of cash required as a reasonable reserve for the claims asserted; (g) the distribution of the amount so reserved is barred by local law; (h) the reserve is banked as required by that law; (i) nothing remains to be done except the settlement of the asserted claims; (j) there is no commercial ac-

tivity; (k) there is no purposeful delay; (l) final payment is effected forthwith upon the settlement of the last claim; and (m) the record does not support an inference of bad faith, the practicalities qualify the situation as one of full compliance with § 112(b) (6) and the taxpayer is entitled to the tax-free benefits of that section.

The judgment of the district court is reversed and the case remanded for the entry, in the manner specified by the parties' stipulation on file, of a judgment in favor of the taxpayer.