**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 46841**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, January 2020 Term |
| | ) | |
| v. | ) | Opinion filed: April 22, 2020 |
| | ) | |
| JAMES DAVID BURKE, | ) | Karel A. Lehrman, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County. Cynthia K.C. Meyer, District Judge.

The judgment of the district court is <u>reversed</u>.

Eric Don Fredericksen, State Appellate Public Defender, Boise, for Appellant. Jenevieve C. Swinford argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent. Kale D. Gans argued.

_____

MOELLER, Justice.

This case concerns credit for time served under Idaho Code section 18-309. Prior to sentencing, the defendant, James David Burke, was committed to the state mental hospital for 56 days to restore him to competency. After being evaluated and deemed competent to proceed to trial, Burke was returned to the county jail and later pleaded guilty pursuant to a plea agreement. At the conclusion of his sentencing hearing, Burke sought credit for the 56 days of time spent in court-ordered commitment. The district court denied the motion, concluding that commitment to a state mental hospital does not fall under the definition of 'incarceration' in Idaho Code section 18-309. For the reasons set forth below, we reverse.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On February 7, 2018, defendant James David Burke called in a welfare check for himself. Burke made statements about having suicidal thoughts, "wanting to hurt himself[,] and wanting to

1

go to the hospital." During this contact, police discovered Burke was not complying with his registration requirements as a sex offender because he was not living at the address where he was last registered. During this welfare check, Burke's communications with the police were "evasive" and "incoherent." Burke told the officers "he had to move after fighting a demon that had an atomic bomb," but that he "won the fight and buried the bomb with dirt."

Police transported Burke to the crisis center for a mental health evaluation. They warned Burke that he needed to register his new address immediately upon release from the crisis center or he would be charged with failure to register. Three weeks later, after Burke remained noncompliant, police arrested Burke for failure to register, a felony under Idaho Code section 18-8309, and sought a sentencing enhancement based on persistent violator status.

On March 26, 2018, Burke's attorney moved the magistrate court for a psychiatric evaluation to determine Burke's mental competency for court proceedings pursuant to Idaho Code sections 18-210 and 18-211. The magistrate court granted the motion on March 28, 2018. The later assessment reported that although Burke displayed "a pattern suggestive of a nonspecific psychotic disorder," Burke was fit to proceed. However, the evaluator further noted that Burke was mentally ill and "gravely disabled" because of his psychotic disorder. Consequently, the magistrate civilly committed Burke pursuant to Idaho Code section 66-329.[1] Burke was discharged on May 14, 2018, and returned to custody. On June 1, 2018, the magistrate court found Burke fit to proceed and allowed him to waive his preliminary hearing, Burke later pleaded guilty as part of a pretrial settlement offer. The district court then released Burke on his own recognizance.

On August 22, 2018, the date originally scheduled for Burke's sentencing, his attorney requested an additional psychiatric evaluation pursuant to Idaho Code sections 18-210 and 18-211. This was done to address defense concerns that "the information in the Presentence Investigation Report leads [sic] to believe that Mr. Burke suffers from a significant mental illness or disability." The district court continued the sentencing and ordered an additional psychiatric evaluation. The second evaluation, completed on October 12, 2018, diagnosed Burke with schizophrenia and concluded that Burke was incompetent and unfit to proceed with the pending legal proceedings against him. Accordingly, on October 18, 2018, the district court entered an order committing Burke to the custody of the director of the Idaho Department of Health and Welfare ("IDHW").

---

[1] The record of this separate proceeding is not before us; however, Burke is not seeking credit for the time he spent in treatment pursuant to the civil commitment order.

The order was not signed until October 22, 2018. Burke was then taken into custody by IDHW and housed at State Hospital North until December 17, 2018, for a total of 56 days.

After Burke was deemed competent, the district court released Burke on his own recognizance and rescheduled his sentencing for December 22, 2018. At sentencing, Burke received a total unified sentence of five years, with two years fixed followed by three years indeterminate. It was further ordered that the execution of the sentence "be suspended for a period of two (2) years, during which time [Burke would] be on supervised probation." Burke then sought credit for the 56 days he was committed for treatment at State Hospital North pursuant to Idaho Code section 18-212. After considering the briefing from both parties on the matter, the district court denied Burke's request for credit for time served. The district court concluded that "commitment to a state mental hospital is not 'incarceration' for the purposes of Idaho Code § 18-309." Burke timely appealed.

## II.     STANDARD OF REVIEW

Statutory interpretation is a question of law that receives de novo review from this Court. *State v. Schulz*, 151 Idaho 863, 865, 264 P.3d 970, 972 (2011). We begin statutory interpretation with the literal language of the statute, giving words their plain, usual, and ordinary meanings. *Id.* at 866, 264 P.3d at 973. In addition, provisions are interpreted within the context of the whole statute, not as isolated provisions. *Id.* This includes giving effect "to all the words and provisions of the statute so that none will be void, superfluous, or redundant." *Id.* Where the language is unambiguous, we need not consider the rules of statutory construction. *Id.* "Ambiguity is not established merely because differing interpretations are presented to a court; otherwise, all statutes subject to litigation would be considered ambiguous." *Hamilton ex rel. Hamilton v. Reeder Flying Serv.*, 135 Idaho 568, 572, 21 P.3d 890, 894 (2001).

## III.     ANALYSIS

The single issue on appeal is whether the plain meaning of "incarceration," as used in Idaho Code section 18-309, includes time a defendant spends in confinement during a court-ordered commitment to a state mental hospital pursuant to sections 18-211 and 18-212. Neither party argues that the term "incarceration" is ambiguous language in the statute. Burke contends that the plain meaning of "incarceration" focuses on the act of "confinement, not the facility," and that "the degree of confinement matters, the location does not." The State argues that "incarceration" plainly refers to a jail or prison. The district court agreed with the State below, and concluded that

"incarceration" does not include commitment to a state mental hospital because incarceration means confinement in a jail or prison.

Our analysis begins with a review of the relevant statutes and dictionary definitions. Idaho Code section 18-309 provides, in part, "the person against whom the judgment was entered shall receive credit in the judgment for any period of *incarceration* prior to entry of judgment, if such *incarceration* was for the offense or an included offense for which the judgment was entered." I.C. § 18-309(1) (emphasis added). Despite the statute's purpose—granting defendants full credit for their time served prior to judgment—it is troubling that it lacks a statutory definition for the term "incarceration." While this credit-computation statute has been interpreted numerous times in the last four years, *see e.g. State v. Osborn*, 165 Idaho 627, 449 P.3d 419, 424 (2019), this Court has never interpreted its meaning of "incarceration."

"Incarceration" means "The act or process of confining someone; IMPRISONMENT." BLACK'S LAW DICTIONARY, *Incarceration* (11th Ed. 2019). The Latin root "carcer" translates to "jail" or "prison," "especially one used to detain rather than punish." BLACK'S LAW DICTIONARY, *Carcer* (11th Ed. 2019). Historically, "carcer" was used in English and Roman law to refer "to a jail used as a place of detention during trial or after sentence pending execution, rather than as a place of punishment." *Id.* "Confinement," in turn, is defined as "[t]he act of imprisoning or restraining someone; the quality, state, or condition of being imprisoned or restrained[.]" *Confinement*, Black's Law Dictionary (11th ed. 2019). Naturally, jails and prisons are the typical examples of incarceration that first come to mind. However, while "incarceration" clearly includes imprisonment within a jail or prison, the plain definition focuses on confinement and detention—*i.e.* the restrictions to liberty—rather than a place of sentencing or punishment.[2]

---

[2] The dissent references the emerging field of corpus linguistics and the work of Stephen C. Mouritsen to urge the Court to move beyond "the fortress of a dictionary and the logic of other courts" when defining legal terms. Stephen C. Mouritsen, *The Dictionary Is Not A Fortress: Definitional Fallacies and A Corpus-Based Approach to Plain Meaning*, 2010 BYU L. Rev. 1915, 1915 (2010) (quoting Judge Learned Hand in *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945), *aff'd*, 326 U.S. 404 (1945)). While we do not foreclose the possibility of considering this type of linguistic evidence in the future, neither side has submitted such evidence in this case, as the dissent acknowledges. Therefore, we are left with applying an ancient, yet well-established interpretive tool of an appellate court: the dictionary. *See, e.g.*, *Arnold v. City of Stanley*, 158 Idaho 218, 221, 345 P.3d 1008, 1011 (2015) ("To ascertain the ordinary meaning of an undefined term in a statute, we have often turned to dictionary definitions of the term."). Notwithstanding the esteemed Judge Learned Hand's oft-quoted observation in 1945 that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary," *Cabell*, 148 F.2d at 739, we are persuaded that the dictionary remains a crucial tool in statutory interpretation. We are not alone in this belief. *See* John Calhoun, *Measuring the Fortress: Explaining Trends in Supreme Court and Circuit Court Dictionary Use*, 124 Yale L.J. 484, 498 (2014) ("From 1985 to 1999, dictionary usage [by U.S. Supreme Court Justices] increased three hundred percent in proportional terms. By 2010, Supreme Court opinions cited dictionaries four times as often

This plain meaning interpretation of "incarceration" is consistent with other terms the legislature has defined. For instance, "prisoner" is defined as "a person . . . who is being detained pursuant to a court order," and "[w]ho is being housed in any state, local or private correctional facility[.]" I.C. § 18-101A(6). The fact that Burke was detained pursuant to a court order is without question. Likewise, in Idaho Code section 18-101A, which contains a series of definitions that are applicable throughout the criminal code, the term "correctional facility" is defined as

> a facility for the confinement of prisoners or juvenile offenders. The term shall be construed to include references to terms including, *but not limited to*, "prison," "state prison," "state penitentiary," "*governmental detention facility,*" "penal institution (facility)," "correctional institution," "juvenile correctional center," "Idaho security medical program," "*detention institution (facility),*" "juvenile detention center (facility)," "county jail," "jail," "private prison (facility)," "private correctional facility," or those facilities that detain juvenile offenders pursuant to a contract with the Idaho department of juvenile corrections.

I.C. § 18-101A(1) (emphasis added).

Given the expansive language "including, but not limited to," the *state* hospital where Burke was *detained* pursuant to court order falls within the ambit of the statute. In this case, the district court entered a court order committing Burke to the custody of the Idaho Department of Health and Welfare in order to restore his competency. I.C. § 18-212(2). Burke was confined inside State Hospital North and any unauthorized departure from the facility would have been deemed an "escape." I.C. § 18-212(6). Reading Idaho Code section 18-101A(1) broadly—as is required by the language of the statute—a mental health facility in this context would be indistinguishable from a "governmental detention facility" or a "detention institution (facility)" and hence a "correctional" facility. Because Burke was committed by a court order and detained in a "correctional" facility, Burke was a "prisoner" pursuant to Idaho Code section 18-101A(6).

The State relies on a case from the Idaho Court of Appeals that interpreted "incarceration" in the context of house arrest. In *State v. Climer*, the Idaho Court of Appeals held that a prejudgment house arrest did not constitute "incarceration" for calculating credit for time served. 127 Idaho 20, 23, 896 P.2d 346, 349 (Ct. App. 1995). However, the court distinguished between

---

as in 1985—and over *seven* times more often than in 1950.") (emphasis included). It appears that rumors of the dictionary's demise as a legal reference tool may have been greatly exaggerated.

house arrest and jail or prison by engaging in what appears to be a liberty-restriction analysis. 127 Idaho at 23–24, 896 P.2d at 349–50.

> [H]ome confinement, as a condition of pretrial release, is not equivalent to confinement in a jail or prison because an "offender who is detained at home is not subject to the regimentation of penal institutions" but "once inside the residence, enjoys unrestricted freedom of activity, movement, and association." *State v. Ramos*, 561 N.E.2d 643, 647 (1990). "Furthermore, a defendant confined to his residence does not suffer the same surveillance and lack of privacy associated with becoming a member of an incarcerated population." *Id.*

*Id.* (parallel citations omitted). The Court of Appeals rejected the argument that house arrest fell within the definition of incarceration, reasoning that house arrest did not constitute a sufficient restriction on the defendant's liberty. Instead, the court appropriately concluded that *house arrest* does not rise to the equivalent level of incarceration associated with prison or jail. *See id.* No Idaho appellate court has expressly rejected a liberty-restriction analysis in calculating time served.

Other states have also held that commitment to a state mental hospital is synonymous with incarceration due to the equivalent restrictions to liberty or because the time spent in custody is a result of the criminal offense. *See Harris v. Charles*, 256 P.3d 328, 337 (Wash. 2011) ("Time in incarceration includes mandatory time spent in a state mental hospital."); *Asfaha v. State*, 665 N.W.2d 523, 528 (Minn. 2003) (jail credit should be awarded where a treatment facility is "the functional equivalent of . . . a jail, workhouse, or regional correctional facility."); *State v. Jordan*, 485 N.W.2d 198, 201 (Neb. 1992) (addressing probation but holding " 'in custody' means judicially imposed physical confinement in a governmental facility authorized for detention, control, or supervision of a defendant before, during, or after a trial on a criminal charge."); *People v. Williams*, 318 N.E.2d 692, 694 (Ill. 1974) ("the time spent by the defendant in a California mental institution was 'time spent in custody as a result of the offense for which the sentence was imposed.' ").

For example, the Florida Supreme Court held that a defendant's "coercive commitment to a state institution was indistinguishable from pretrial detention in a 'jail,' " because he "was in the total custody and control of the state at all times." *Tal-Mason v. State*, 515 So. 2d 738, 739 (Fla. 1987). "[T]he primary purpose of both the [psychological] treatment and the detention was to hold [the defendant] until such time as he became competent to stand trial, if ever." *Id.* This decision also rested on the interpretation of "jail" in Florida's credit-computation statute, which stated: "[T]he court imposing a sentence shall allow a defendant credit for all of the time he spent in

6

the *county jail* before sentence." *Id.* (quoting Florida Code § 921.161(1)). Likewise, in California, the time served computation statute "provides for a mandatory credit to his sentence of all time spent by a defendant 'in custody in any city, county, or city and county jail,' " which includes time spent committed in a state hospital. *People v. Cowsar*, 115 Cal. Rptr. 160, 160 (Ct. App. 1974). Both the logic and policy considerations in these cases from other jurisdictions are compelling.

Here, Burke's court-ordered commitment to state custody to restore competency contained all the hallmarks of incarceration. Once ordered, Burke had no choice to reject the commitment and no option to terminate it early of his own volition—the commitment was mandatory. I.C. § 18-212. The order of commitment issued by the court required the county sheriff to transport Burke to the facility. *Id.* The State had complete and total control of Burke at all times. Accordingly, once committed to the state hospital, Burke did not enjoy "unrestricted freedom of activity, movement, and association." *See Climer*, 127 Idaho at 23, 896 P.2d at 349 (citation omitted). Further, once Burke was committed to the state hospital, he was "under the same surveillance and lack of privacy associated with becoming a member of an incarcerated population." *Id.* at 24, 896 P.2d at 350 (quotation omitted). In addition, a defendant in Burke's position may even be subjected to a court order requiring involuntary treatment, if the defendant refuses to comply with the prescribed treatment regimen. I.C. § 18-212(3). This degree of control, supervision, and restriction is virtually indistinguishable from detention in a prison or jail. Therefore, all of the factors the Court of Appeals found did not apply to the house arrest in *Climer*, are present in this case. Accordingly, we conclude that *Climer* does not support the district court's decision in this case.

After reviewing this issue carefully, we must disagree with the district court's thorough and thoughtful analysis and hold that court-ordered commitment to state custody pursuant to Idaho Code sections 18-210 and 18-211 meets the functional and legal definition of "incarceration" under Idaho Code section 18-309. The extent of the liberty interests restricted by Burke's court-ordered commitment to State Hospital North are just too similar to imprisonment to conclude otherwise. Accordingly, we reverse the district court's order denying Burke's request for credit for time served and remand the case for the district court to enter an order crediting him with the fifty-six days he spent committed to State Hospital North while the State restored his competency to face criminal charges.

## IV. CONCLUSION

For the foregoing reasons, we reverse the district court and remand this matter for further action consistent with this decision.


Chief Justice BURDICK, Justices BRODY and STEGNER **CONCUR.**


BEVAN, Justice, dissenting:

This case concerns what the majority characterizes as a straightforward analysis of the plain meaning of "incarceration," as used in Idaho Code section 18-309. Because I believe the plain meaning of incarceration does not include being confined for treatment and restoration of mental competency, I respectfully dissent.

The majority recognizes the goal before us. "The objective of statutory interpretation is to give effect to legislative intent." *Guenther v. Ryerson*, ___ Idaho ___, ___, 458 P.3d 184, 193–94 (2020) (quoting *State v. Olivas,* 158 Idaho 375, 379, 347 P.3d 1189, 1193 (2015)). Determining legislative intent "must begin with the literal words of the statute; those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole." *Id*. This mandate requires that we not view words like "incarceration" in a vacuum, but that we seek to discern "the plain meaning of the whole statute, not of isolated sentences." *Beecham v. United States*, 511 U.S. 368, 372 (1994). The result reached by the majority, however, isolates the word incarceration from the rest of the statute, ignores its "ordinary meaning" and expands its scope to a mental infirmary – a place which is neither a jail, nor a penitentiary, and where incarceration simply does not occur.

The majority views the word "incarceration" as unambiguous. But the word "incarceration" *is* ambiguous as applied by the majority here. A statute "is ambiguous where reasonable minds might differ or be uncertain as to its meaning." *City of Idaho Falls v. H-K Contractors, Inc.*, 163 Idaho 579, 582, 416 P.3d 951, 954 (2018). The competing views of this case are both reasonable. Thus, we must resort to more than a dictionary definition or reliance on out-of-state courts' views of their own statutes to resolve this question. Instead, we must determine legislative intent "by examining not just the literal words of [Idaho's] statute, . . . [but by also viewing] the reasonableness of proposed constructions, the public policy behind the statute, and its legislative history." *Id*. (internal citations and quotations omitted). Application of these standards to the question before us leads to but one conclusion. To receive credit for time served

towards his *penitentiary sentence*, a convicted defendant like Burke must be held in a "correctional facility" as defined by Idaho Code section 18-101A. Mental hospitals are not correctional facilities.

The majority recognizes this dichotomy, but it resorts to the fortress of a dictionary and the logic of other courts[3], to simply conclude that it is "plain" that the "definition focuses on confinement and detention—*i.e.* the restrictions to liberty," as the focal point in its analysis. Judge Learned Hand has recognized that "it is one of the surest indexes of a mature and developed jurisprudence *not* to make a fortress out of the dictionary." Stephen C. Mouritsen, *The Dictionary Is Not A Fortress: Definitional Fallacies and A Corpus-Based Approach to Plain Meaning*, 2010 BYU L. Rev. 1915, 1915 (2010) (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945), *aff'd*, 326 U.S. 404 (1945) (emphasis added)). Relying upon a dictionary and other courts who use such definitions often results in decisions that are driven more by the desired outcome, than by reasoned analysis. Mr. Mouritsen recognized:

> The judicial conception of lexical meaning--i.e., what judges think about what words mean, or, more importantly, how judges arrive at the meaning of contested terms--is often outcome determinative. Vast fortunes or years of confinement may balance precariously on the interpretation of a single word. When faced with hard cases--cases in which contextual cues or legislative definitions do not decisively favor either party's asserted meaning--judges, like many speakers of English, will cast about for interpretive tools, often looking for comfortable reassurance in one of the language's more firmly established and dependably stable institutions--the English dictionary. Such dictionaries, said Justice Jackson, are the last resort of the baffled judge.

Mouritsen, 2010 BYU L. Rev. at 1915 (footnotes and quotation marks omitted). Resorting to the "comfortable reassurance" of the dictionary and the outcome determinative conclusion that "incarceration" focuses on the act of "confinement, not the facility," and that "the degree of confinement matters, the location does not," misses the mark.

This Court must review the entire statute, and resolve the question with more than a simple logical syllogism that someone who is incarcerated is confined; therefore, confinement in a mental hospital is incarceration. By looking to the "literal words of the statute, . . . the reasonableness of

---

[3] The non-Idaho cases relied on by the majority lack application to the literal words of Idaho's statute; other states' statutes are different than Idaho's. The language quoted by the majority from Washington, for example, came from *In re Knapp*, 687 P.2d 1145 (Wash. 1984) (en banc). That case applied a statute which mandated that "custodial confinement in a state mental hospital is substantially synonymous with custodial confinement in prison or jail and that individuals incarcerated in the former should be treated the same as those incarcerated in the latter." *Id.* at 1150 n.2 (citing WASH. REV. CODE § 72.68.031). Such specific directives from the Washington Legislature make its Supreme Court's analysis inapposite to the issue here.

proposed constructions [and] the public policy behind [it]," *H-K Contractors, Inc.*, 163 Idaho at 582, 416 P.3d at 954, we move beyond the dictionary's walls to note the central purpose for Burke going to the State mental hospital in the first place. Burke's confinement was not to punish him for his wrongdoing; it was to restore his competency through medical care and treatment. Thus, placement in the custody of the Idaho Department of Health and Welfare (IDHW), even by court order, is a health-related act; it has nothing to do with punishment for the crime which brought Burke into the jail in the first place.

This result also reflects common usage[4] of the term "incarcerated," which is seldom used when someone is "committed" to a mental health facility for medical care. The legislature's addition of the phrase "if such incarceration was for the offense or an included offense for which the judgment was entered" adds further direction to our analysis. I.C. § 18-309. Unlike time served in jail awaiting trial, the time which a defendant, such as Burke, spends in the custody of IDHW for diagnostic and treatment purposes is not incarceration *for an offense for which a judgment had been (or could be) entered*. Here, although his charges may have precipitated the need to determine his mental competency, Burke's commitment to State Hospital North was not for his failure to register as a sex offender, but was ordered—in this case in response to his own motion—to ascertain, treat, and restore his competency to participate in his upcoming legal proceedings.

This interpretation also aligns with other terms the legislature has defined. As also noted by the majority, in Idaho Code section 18-101A, a series of definitions applicable throughout the criminal code, defines the term "correctional facility" as

> a facility for the confinement of prisoners or juvenile offenders. The term shall be construed to include references to terms including, but not limited to, "prison," "state prison," "state penitentiary," "governmental detention facility," "penal institution (facility)," "correctional institution," "juvenile correctional center," "Idaho security medical program," "detention institution (facility)," "juvenile detention center (facility)," "county jail," "jail," "private prison (facility)," "private correctional facility," or those facilities that detain juvenile offenders pursuant to a contract with the Idaho department of juvenile corrections.

---

[4] Mr. Mouritsen's article focuses on and advocates for a more objective approach than simply opening a dictionary to resolve statutory interpretation–the use of Corpus Linguistics. While neither party, nor the court below relied on this innovative tool to resolve this question, I note that a simple search for the word "incarceration" in the Corpus of Historical American English, or COHA, reveals 442 uses of incarceration in the 400-million-word database between 1810 and 2009. None of these uses involved "incarceration" in a mental institution, and only three referenced incarceration in an asylum. These results once again evidence the usefulness and objectivity of determining the meaning of words through corpus linguistics, rather than through simply turning to a dictionary to reach a desired result.

This definition limits the term "correctional facilities," where incarceration actually takes place, to traditional places of criminal detention and custody, such as jails and prisons. It lacks any reference to mental health facilities, sanitariums, or hospitals. That this language includes the "not limited to" clause is not carte blanche to expand the "plain meaning" of this clause to include other sites which focus on medical treatment, even if one is "confined" there. Thus, a mental hospital is not a correctional facility; thus, it is not a place of confinement "for" the sex offender charge that brought Burke before the court.

In contrast, Idaho Code section 18-212 requires that a defendant who is considered mentally unfit to proceed in a criminal matter must be committed to IDHW "for care and treatment at an appropriate facility," which could include "a state hospital, institution, mental health center, or those facilities enumerated in subsection (8) of section 66-402, Idaho Code, equipped to evaluate or rehabilitate such defendants." I.C. § 18-212(2). In short, a defendant who lacks competency for a criminal proceeding is transferred to the custody of IDHW, treated medically, evaluated for fitness to proceed, and rehabilitated in an effort to restore competency. *Id.* While such a person is "confined," his confinement is not punitive, and is therefore not "for the offense . . . for which the judgment was entered." I.C. § 18-309. These separate statutes highlight the stark contrast between how the legislature has defined correctional facilities and treatment facilities— with no apparent crossover. Thus, the majority's expansion of correctional facilities to include treatment centers goes beyond the reasonableness of the definitional limitations of these statutes.

In addition, if we look to the whole of the statute at issue, the title of the statute we are examining is "Computation of Term of Imprisonment," which likewise points the way to what incarceration means when used in this statute. It has to do with *imprisonment*. Each subsection of the statute begins with the words: "In computing the term of *imprisonment. . . .* " (emphasis added). The purpose of this statute is thus to give credit *towards a term of imprisonment* for time spent incarcerated before sentencing. Thus, the statute itself provides that imprisonment is a key element to analyzing what incarceration means.

Finally, if we wish to examine the linguistics behind the word incarceration, we can, like the majority, note that "carcer" is Latin for jail, or prison. "*Carcer*, as used in English law and Roman law, usu[ally] referred to a jail used as a place of detention during trial or after sentence pending execution, rather than as a place of punishment. *The modern term* incarceration *derives from this word.*" *Carcer*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). Thus, the

plain meaning of incarceration, as used in section 18-309, necessarily involves custody in a jail or prison—places of imprisonment.

Each of these reasons establishes that the plain meaning, the reasonableness of proposed constructions, the statutory framework, and even the etymology of the word itself support a result contrary from that reached by the majority. I therefore respectfully dissent.